**Susan G. NAGEL, individually, and on behalf of others similarly situated, as a class on the Warn claim, Plaintiff,**

v.

**SYKES ENTERPRISES, INC., Defendant.**

No. A1–04–039.

United States District Court, D. North Dakota, Southwestern Division.

Aug. 25, 2005.

John J. Gosbee, Mandan, ND, for Plaintiff.

Michael D. Malfitano, Constangy Brooks & Smith LLC, Tampa, FL, John W. Campbell, Shane A. Hanson, Fleck, Mather & Strutz, Ltd., Bismarck, ND, John W. Morrison, Jr., for Defendant.

## ORDER GRANTING PARTIAL SUMMARY JUDGMENT FOR DEFENDANT

HOVLAND, Chief Judge.

Before the Court is the Defendant's Motion for Summary Judgment filed on May 31, 2005. The Plaintiff has filed a responsive brief opposing the motion. For the reasons set forth below, the Court grants the motion in part.

## I. BACKGROUND

The plaintiff, Susan Nagel, is a former employee of Sykes Enterprises ("Sykes") in Bismarck, North Dakota. Sykes provides customer care management solutions for companies involved in technical, financial and communications industries. Sykes' operations are account driven, meaning employees are hired and retained to work on specific accounts. As part of its operations, Sykes maintains a facility in Bismarck, North Dakota. *See* Declaration of Kenneth Cass, ¶¶ 3–5. Nagel was hired by Sykes in September of 1999 to work as a telephone Customer Support Technician ("CST"). *See* Complaint, ¶ 12. CST's are responsible for receiving phone calls from the client's customers and providing the callers with customer service. *See* Declaration of Rene Lafferty, ¶ 6. Nagel was originally assigned to work on Account Abel, but later transferred to Account Baker.[1] *See* Complaint, ¶ 13.

Beginning in early 2001, Nagel's eyesight began to deteriorate. Doctors opined that Nagel's loss of vision was a result of her diabetes. *See* Deposition of Susan Nagel, p. 108. On April 21, 2001, Nagel reported to Dr. Curt Wischmeier who performed laser surgery on Nagel's left eye. Nagel returned to Dr. Wischmeier on April 13, 2002, at which time he recommended additional retinal surgery. *See* Deposition of Curt Wischmeier, pp. 7, 14, 16, 23, 27, and 28. Following Dr. Wischmeier's recommendation, Nagel underwent surgery on her right eye.[2] *See* Deposition of Susan Nagel, p. 117. Nagel was able to return to work at Sykes following

---

1. To retain the confidentiality of Sykes' clients, the parties have agreed not to disclose the names of specific client accounts that were handled in Bismarck. As a result, the parties have agreed on the following alternative names: Accounts Abel, Baker, Charlie, and David. *See* Complaint, ¶ 13; Defendant's Statement of Undisputed Material Facts, p. 2, n. 1.

2. The second surgery was not performed by Dr. Wischmeier. It appears that the surgery may have been performed by a Dr. Benton. *See* Deposition of Susan Nagel, p. 117.

the surgery. *See* Declaration of Rene Lafferty, ¶ 13.

When she returned to work, efforts were made by both Nagel and Sykes to compensate for her failing vision. Nagel tried to overcome her vision problems by adjusting the resolution on her monitor, using a hand-held magnifier, wearing bifocals, writing with broad-tip pens, and relying on assistance from co-workers. *See* Deposition of Susan Nagel, pp. 145–146, 212; Complaint, ¶ 17. In addition, Sykes furnished Nagel with screen guards and screen magnifiers to aid her. *See* Deposition of Susan Nagel, pp. 462–463. Nagel requested additional help from Sykes in the form of an LCD computer monitor and specific computer software and hardware to assist her,[3] but the requests were allegedly denied. *See* Deposition of Susan Nagel, pp. 216–217. Even with the assistance, Nagel continued to have difficulties reading a computer screen. *Id.* 214–215. Despite her vision, Nagel was still able to adequately assist customers as evidenced by her positive job reviews throughout this time period. *Id.* at 215; *see* Declaration of Rene Lafferty, ¶¶ 14–15.

On or about April 2, 2002, pursuant to the Worker Adjustment Retraining and Notification (WARN) Act, Sykes notified Nagel, along with most of the employees assigned to Account Baker, that she was to be laid off. The notice reads as follows:

> As an ongoing process, we are constantly evaluating our financial performance to determine if we are in the best position to meet the needs of our customers, our employees, and our shareholders. Likewise our clients are conducting similar evaluations to determine the best means of servicing their customers and meeting their business objectives. As a result of these evaluations, our clients have informed us that we must make significant reductions in our workforce due to the lack of call volumes and guaranteed forecasts. These reductions will occur at 1721 South Sykes Street, Bismarck, North Dakota, 58504. With this decision, I regret to inform you that your position is scheduled to be eliminated as of June 1, 2002.
>
> Their decision in no way is a reflection on your personal work and accomplishments. Each of you have worked hard to fulfill your professional responsibility, and I thank you.
>
> According to the Federal WARN Act (Public Law 100–379), SYKES is required to provide all regular full and part time employees with sixty (60) days written notice of a permanent layoff. In accordance with the provisions of the Act, you will be compensated through your notice date of June 1, 2002, for what would be normal business hours during this time. Employees must remain actively employed through the completion of the transition efforts in order to be eligible for compensation through June 1, 2002.*
>
> We are in the process of working with the unemployment office to help provide job placement assistance, on-site layoff transition workshops and information about unemployment compensation, just to name a few of the services we hope we can offer during this transition period. However, I understand that many of you will have immediate questions and concerns. Please feel free to contact Bill Peltz (701) 221–0700 or Rene Lafferty (701) 221–0700.
>
> This is a difficult time for everyone involved. We are committed to providing you with the guidance you may need

---

3. Specifically, Nagel requested the computer software utilized by Jeremy Schmidt. *See* Deposition of Susan Nagel, p. 216. Schmidt is a legally blind individual employed at Sykes in Bismarck. *See* Declaration of Cassandra Thompson, ¶¶ 5–7.

during this transition. In return, we are confident that you will continue to provide the high quality service our customers have come to rely on.

I would like to thank you again for your dedication, hard work and contribution to Sykes over the years

Plaintiff's Ex. SGN–09. The WARN notice was extended on May 3, 2002, via letter. However, Nagel was eventually terminated on July 8, 2002. *See* Declaration of Rene Lafferty, ¶ 16.

Approximately three weeks later, on July 29, 2002, Nagel was contacted by Sykes to fill a vacancy on a new account—Account Charlie. *See* Complaint, ¶ 16; Declaration of Rene Lafferty, ¶ 18. Nagel was one of the first employees contacted for the new openings. *See* Declaration of Rene Lafferty, ¶ 19. She accepted the position.

Upon her return to work, Nagel's vision continued to deteriorate due to her ongoing struggle with diabetes. Ultimately, on December 16, 2002, Nagel lost her vision completely. *See* Complaint, ¶ 21. Nagel underwent surgery on her left eye on December 19, 2002. Following surgery, Nagel was still unable to see—her right eye remained blind and her left eye needed to be bandaged following surgery. She informed Sykes that she would need six weeks to recover. *See* Deposition of Susan Nagel, pp. 209, 246, 255, and 256.

According to Nagel, following surgery she made attempts to again secure the computer software being utilized by Jeremy Schmidt, a legally blind employee at Sykes. Initially, on December 20, 2005, Nagel spoke with Cassandra Thompson, the Human Resources Director for Sykes, and requested the computer software. *See* Deposition of Susan Nagel, p. 247. According to Nagel, Thompson said that she

would have to look into securing the software and would attempt to have it set up for her in the near future. *Id.* at 250–252. Later, on December 27, 2002, Nagel claims that Thompson told her that she would be responsible for purchasing the software and that Sykes could not guarantee her a job even with the software.[4] *Id.* at 245–246. Further, Nagel claims that Thompson insisted Sykes did not want to hire more legally blind individuals because the software was too expensive. *Id.* at 456–457.

During this same time, Nagel also asked that she be given other opportunities to remain employed. Specifically, Nagel requested the opportunity to "Y-in" junior technicians, or receive "Y-in" training herself. *See* Deposition of Susan Nagel, pp. 253–255. "Y-in" training, as its called, is the process where a CST receives additional training from a senior CST or a Team Manager who monitors the trainees phone calls. *See* Declaration of Rene Lafferty, ¶ 9. "Y-in" training is only made available to those CST's who have begun account specific classroom training. *Id.* ¶¶ 9–10. Nagel believes that she should have been able to take advantage of "Y-in" opportunities as early as December 16, 2005. *See* Deposition of Susan Nagel, p. 256–257. Alternatively, Nagel said she would be willing to do janitorial work. *Id.* at 310.

On December 23, 2002, Sykes received a letter from Dr. Charles R. Volk, Nagel's treating physician. In the letter Dr. Volk reported that "[v]isual acuity is light perception on the right and 20/400 on the left. Visual acuity of 20/400 or less is considered legal blindness in the state of North Dakota." Declaration of Cassandra Thompson Ex. 3. For that reason, Dr. Volk explained

---

4. It was Nagel's understanding that Jeremy Schmidt had purchased his own software, an allegation that Sykes denies. *See* Deposition of Susan Nagel, pp. 451–452; Declaration of Cassandra Thompson, ¶ 7.

that Nagel is "legally blind" and should be provided with "software and/or devices for her to be able to work." *Id.*

On or around December 30, 2002, Cassandra Thompson asked Nagel to attend a vocational assessment with a state vocational rehabilitation counselor at the West Central Services Center in Bismarck, North Dakota, with her accompaniment. *See* Deposition of Susan Nagel, p. 495; Declaration of Cassandra Thompson, ¶ 24. The purpose of the assessment was to identify what accommodations, if any, would best serve Nagel. *See* Declaration of Cassandra Thompson, ¶ 24. Nagel was reluctant to attend the assessment and would not allow anyone from Sykes to accompany her. *Id.* ¶ 25. Nagel was under the impression that she would need to quit her job at Sykes in order to attend the assessment, something she was unwilling to do. *Id.* at 443 and 495. Nagel told Thompson that she would attend only if she could be assured of her job back upon completion. *Id.* at 443.

In early January, Nagel contacted Dr. Curt Merkel, a vocational rehabilitation counselor at Southeast Human Service Center in Fargo, North Dakota, to generate a list of accommodations. *See* Deposition of Susan Nagel, pp. 495–496. It appears that Nagel originally telephoned Dr. Merkel and requested a list of recommendations, nothing more. *See* Deposition of Curtis Merkel, p. 22. In response, Dr. Merkel wrote Nagel a letter refusing to offer recommendations without completing a proper assessment, stating that to do so "would be both a disservice to yourself as well as the employer." *Id.* Dr. Merkel further stated

I would be more than happy to conduct a complete assessment and come up with a list of specific worksite recommendations, but in order to do so, I would need your approval to contact the appropriate personnel at Sykes Enterprises, go out and observe the worksite and also review medical records in relation to your vision loss in addition to what we have been talking about already.

*Id.* at 23.

Shortly thereafter, unbeknownst to Sykes, Nagel attended a lab session with Dr. Merkel. *See* Deposition of Susan Nagel, p. 496; Declaration of Cassandra Thompson, ¶ 26. At the session, Nagel tried out numerous types of software and hardware. *See* Deposition of Susan Nagel, p. 496. Afterwards, Dr. Merkel wrote Nagel another letter listing specific items which he believed would assist her at work. *See* Deposition of Curtis Merkel, p. 25. However, Dr. Merkel noted in the letter that his recommendation was tempered by the fact that he had not been able to contact Sykes as is his normal practice before offering recommendations. *Id.* Dr. Merkel wrote, "Without being able to contact your employer to find out specific information about your job and to look at the actual jobsite, I am not able to guarantee that what works well for your in the technology lab will work equally well on the job." *Id.* Nagel would not open an account with the Southeast Human Service Center, nor disclose her personal medical information to Dr. Merkel. *Id.* at 34.

On January 21, 2003, Sykes received a letter from Nagel which read as follows:

The following hardware and software should allow me to do my job. All should qualify as reasonable accommodations for my vision impairment.

19″ Flat Screen Monitors with screen guards—one for each monitor I work on.

Zoom Text Extra 7.0 for Windows 98 and for Windows 2000—appropriate version for the 2 computers I work on. For information go to *http://www.aisquared.com.*

Expert Mouse Pro for each system I work on. Available at *http://www.infogrip.com.*

Large Print Keyboard for each computer I work on available at *http://www.gentek-ind.com* or *http://www.infogrip.com.*

Possibly you may want to check on big button speaker phone # JT—p550 available from http://www.maxiaids.com. I refuse to purchase the software or hardware as you directed me to do in order for me to return to work at Sykes. I did, however, find these reasonable accommodations Sykes can put into place so I can resume my employment.

Surely with Sykes vast resources you could have worked with me on this.

Once again, I urge you to allow me to return to work until you have something in place as far as software and hardware. You could either allow me to "Y" or you could hire a reader for me. It has been financially and unnecessarily stressful on me. Please return me to work as soon as possible.

Thank you for your attention. I look forward to returning to work with reasonable accommodations under ADA regulations.

Declaration of Cassandra Thompson Ex. 4. The items listed in the letter were those recommended to her by Dr. Merkel.

On April 1, 2003, Kenneth Cass, the Director of Employment Compliance at Sykes, wrote a letter to Nagel's attorney.[5] *See* Declaration of Kenneth Cass, Ex. 3. In the letter, Cass explained that Sykes would need to know Nagel's present medical condition in order to properly assess the situation and facilitate the accommodation process. It was Sykes' understanding that Nagel had undergone surgery in late December, but the company was unclear as to her medical condition at the present time. Cass proposed that Nagel be examined by a specialist of Sykes' choosing. The specialist would need to be furnished with Nagel's job description, job duties, and medical records. With the information gathered, the specialist would be in a position to advise Sykes about Nagel's medical condition and her ability or inability to perform her job duties. As stated by Cass, "The company would then be able to sit down with Ms. Nagel and with Vocational Rehabilitation in Bismarck to explore possible accommodations." *Id.*

Nagel's attorney rejected Sykes' request in a letter dated April 3, 2003. *See* Declaration of Kenneth Cass, Ex. 4; Declaration of Kenneth Cass, ¶ 8. The letter explained that Sykes' proposal would operate only to further delay Nagel's possible return to work and "contribute nothing to the accommodations that need to be provided to Mrs. Nagel." *See* Declaration of Kenneth Cass, Ex. 4.

Again, on April 17, 2003, Kenneth Cass wrote a letter to Nagel's attorney which reads as follows:

The ADA contemplates an interactive process between the parties. Over the past year Ms. Nagel has requested several items which, she claimed, would enable her to perform her job. The items were provided. In spite of that, she soon became completely unable to perform her job to the point that she had to go home because she could not even read the screen or identify individuals near her. She indicated at the time that she was going to have another surgery on her eyes in late December, and that the results would not be know to her doctors until February, 2003. She has provided nothing regarding that surgery

---

5. Nagel's attorney at the time was Steven L. Latham. Nagel is currently represented by attorney John Gosbee.

or the results. There exists a real issue regarding her ability to perform any of the functions of her job. Her refusal to be examined by a doctor of Sykes' choosing only exacerbates the matter. However, in a continuing effort to resolve this matter and to work with Ms. Nagel, I am requesting the following information:

1. Copies of all medical records relating to her eye condition, her diagnosis, her prognosis, her treatments and surgeries to date, from all physicians involved;

2. An explanation regarding each and every item of hardware and software referred to in her January list, detailing where the list originated; who suggested each item; on what basis, study, or evaluation the suggested item is based; how each item will specifically enable her to perform the duties of her job.

As part of our continuing effort to accommodate your client, the company will refer all of the above to a physician for evaluation and advice. As part of her duty of participating in the interactive process of accommodation, Ms. Nagel will need to provide the physician, once identified, with authorization to contact her doctors to discuss her condition. Following the review, Ms. Nagel will be expected to work with the company and with North Dakota Vocational Rehab to determine what reasonable accommodation(s) may be available.

It is our desire to respond to the needs of Ms. Nagel, as we have been willing to do in the past. She must be willing to work with the company. That is all we ask.

Declaration of Kenneth Cass, Ex. 2.

Throughout this time, Nagel was still retained by Sykes as an "active" employee, but was not scheduled for any shifts or paid her salary. *See* Declaration of Rene Lafferty, ¶ 21. Nagel continued to accumulate vacation time and receive holiday pay.[6] *Id.* ¶¶ 22–23. However, in April 2003, Sykes received notice that the account Nagel was assigned to was being terminated. *Id.* ¶ 25. On or about May 3, 2003, Sykes again sent WARN notices to the employees. Sykes made efforts to transfer employees on the terminated account to existing accounts. The highest ranking employees were the first to receive job transfers. Despite her status, Nagel was considered for one of the vacant positions and her name was transferred on the payroll. *Id.* ¶ 26. However, due to what Sykes considered Nagel's non-compliance throughout the accommodation process, she was not formally notified of the position. *Id.* ¶¶ 27–28. Ultimately, in August 2003, Sykes included Nagel in a reduction-in-force and terminated her employment with the company. *See* Declaration of Kenneth Cass, ¶¶ 30–31.

On April 16, 2004, Susan Nagel filed an action against Sykes in the United States District Court for the District of North Dakota. In the complaint, Nagel alleges violations of the Americans with Disabilities Act (ADA) and the Worker Adjustment and Retraining Notification Act (WARN).[7] Specifically, Nagel contends that Sykes failed to make reasonable accommodations under the ADA and failed

---

**6.** In fact, Nagel was the only Sykes employee on "active leave" in Bismarck that was knowingly paid holiday pay in 2003 and 2004. *See* Declaration of Rene Lafferty, ¶ 24.

**7.** With respect to the WARN claim, the action was purportedly filed on behalf of all individuals similarly situated to Nagel. However, there has been no attempt to satisfy Rule 23 of the Federal Rules of Civil Procedure. At this time, the Court is in no position to certify a class.

to advise Nagel of her bumping rights under WARN. Sykes has moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure as to both claims.

## II. *LEGAL DISCUSSION*

It is well-established that summary judgment is appropriate when, viewed in a light most favorable to the non-moving party, there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Graning v. Sherburne County,* 172 F.3d 611, 614 (8th Cir.1999). A fact is "material" if it might effect the outcome of the case and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Quick v. Donaldson Co., Inc.,* 90 F.3d 1372, 1376 (8th Cir.1996). The moving party has the initial burden of demonstrating to the Court that there are no genuine issues of material fact. If the moving party has met this burden, the non-moving party cannot simply rest on the mere denials or allegations in the pleadings. Instead, the non-moving party must set forth specific facts showing that there are genuine issues for trial. Fed. R.Civ.P. 56(e). A mere trace of evidence supporting the non-movant's position is insufficient. Instead, the facts must generate evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### A. *ADA CLAIM*

The Americans with Disabilities Act (ADA) prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). To establish a claim under the ADA, a plaintiff must show that she "(1) has a 'disability' within the meaning of the ADA, (2) is a 'qualified individual' under the ADA, and (3) 'suffered an adverse employment action as a result of the disability.' " *Fenney v. Dakota, Minnesota & Eastern Railroad Co.,* 327 F.3d 707, 711 (8th Cir. 2003). "Discrimination includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer].' " *Heaser v. Toro Co.,* 247 F.3d 826, 830 (8th Cir.2001) (42 U.S.C. § 12112(b)(5)(A)).

Under the ADA, "[t]he burden of proof depends on the type of claim that is alleged." *Fenney v. Dakota, Minnesota & Eastern Railroad Co.,* 327 F.3d 707, 711 (8th Cir.2003). If the plaintiff makes a reasonable accommodation claim, the court must apply a "modified burden-shifting analysis." *Id.* (citations omitted).

The employee at all times retains the burden of persuading the trier of fact that he has been the victim of illegal discrimination due to his disability. However, once the plaintiff makes "a facial showing that reasonable accommodation is possible," the burden of production shifts to the employer to show that it is unable to accommodate the employee. If the employer shows that the employee cannot perform the essential functions of the job even with reasonable accommodation, the employee must rebut that showing with evidence

of his individual capabilities. At that point, the employee's burden merges with his ultimate burden of persuading the trier of fact that he has suffered unlawful discrimination.

*Benson v. Northwest Airlines,* 62 F.3d 1108, 1112 (8th Cir.1995) (internal citations omitted).

■■■ It appears undisputed that Nagel is "disabled." [8] Her blindness is a physical impairment which limits a major life activity, namely her ability to see. *See* 45 C.F.R. § 84.3(j)(2)(ii) (explaining that "[m]ajor life activities means functions such as caring for one's self, performing manual tasks, walking, *seeing*, hearing, speaking, breathing, learning, and working.") (emphasis added). Further, the record clearly establishes that Nagel "suffered an adverse employment action as a result of the disability." "An adverse employment action is one that causes a material change in the terms or conditions of employment." *Brown v. Lester E. Cox Med. Ctrs.,* 286 F.3d 1040, 1045 (8th Cir. 2002) (citing *Duffy v. McPhillips,* 276 F.3d 988, 992 (8th Cir.2002)). Undoubtedly, Nagel's termination in August of 2003 constitutes an adverse employment action. As a result, the sole remaining issue is whether Nagel is a "qualified individual" under the ADA.

■■■ As defined by the ADA,

[t]he term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential job functions of the employment position that such individual holds or desires. For this subchapter, consideration shall be given to the employer's judgment as to what functions of a job

are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8). Therefore, "[t]he determination of whether a person is 'qualified' under the ADA is a two-fold inquiry: first, the court must determine whether the individual meets the necessary prerequisites for the job, such as education, experience, and training; second, the court must determine whether the individual can perform the essential job functions, with or without reasonable accommodation." *Hatchett v. Philander Smith College,* 251 F.3d 670, 674 (8th Cir.2001). In the present dispute, Nagel can establish the first prong of the analysis by virtue of the fact that she previously held a CST position at Sykes. *Id.* (citing *Browning v. Liberty Mutual Ins. Co.,* 178 F.3d 1043, 1047–48 (8th Cir.1999) (holding that the first prong of the test was established by virtue of the plaintiff previously holding the position)). Having satisfied the first prong, the inquiry becomes whether Nagel can perform the essential job functions of a CST at Sykes, with or without reasonable accommodation.

■■■ "Essential functions of the job are 'fundamental job duties,' and the employer's judgment in this regard is considered 'highly probative.'" *Kammueller v. Loomis, Fargo & Co.,* 383 F.3d 779, 786 (8th Cir.2004) (citing *Alexander v. The Northland Inn,* 321 F.3d 723, 727 (8th Cir.2003)). An essential function of the job may be established by evidence to include: "(1) the employer's judgment as to which functions are essential; (2) writ-

---

8. The ADA defines disability as either:
 (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
 (B) a record of such an impairment; or
 (C) being regarded as having an impairment.
 42 U.S.C. § 12102(2).

ten job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs." *Heaser v. Toro Co.*, 247 F.3d 826, 831 (8th Cir.2001) (citing *Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784, 787 (8th Cir.1998)).

To establish the essential job functions of a CST, Sykes submits the following job description: [9]

**SUMMARY**: Provide quality telephone customer service support to client product users.

**Overall Responsibility**:

1) Maintain availability to provide telephone call support at or above targeted goal.

2) Maintain a call quality rating to meet or exceed targeted levels.

3) Meet or exceed targeted productivity levels.

**Essential Duties**:

1) Report to work on time and be available to take Customer Service calls as scheduled.

2) Answer telephone calls and deliver customer service to client product users.

3) *Follow call script/dialogue guidelines.*

4) Perform data entry tasks as required and in a timely manner.

5) Refer technical and call problems to Technical Team Lead or Supervisor.

**Qualification Requirements**:

To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. The requirements listed below are representative of the knowledge, skill and/or ability required. Reasonable accommodations may be made to enable individuals with disabilities to perform essential functions.

**Education and Experience**: High School diploma or the equivalent, or current student status. Post high school education preferred.

**Language Skills**: Ability to read, analyze, and interpret general business periodicals, professional journals, technical procedures, and computer products. Ability to effectively present detailed information and respond to questions from managers, clients, and customers.

**Reasoning Ability**: Ability to define problems, collect data, establish facts, and draw valid conclusions. Ability to interpret an extensive variety of technical instructions in mathematical or diagram form and deal with several abstract and concrete variables.

**Physical Demands**: The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

While performing the duties of this job, the employee is regularly required to use hands to finger, handle, or feel objects, tools, or controls and talk or hear. The employee frequently is required to sit and reach with hands and arms. The employee is occasionally required to stand, walk, and stoop, kneel, crouch or crawl. The employee must occasionally lift and/or move up to 25 pounds.

The employee is regularly required to concurrently lift and/or move up to 10 pounds. *Specific vision abilities required by this job include close vision and the ability to adjust focus*

---

9. The job description is dated November 1, 1996.

Declaration of Cassandra Thompson, Ex. 1 (emphasis added). The job description is corroborated by Human Resources Administrator, Cassandra Thompson, who attests that "[e]ach CST has the same essential job duties." Declaration of Cassandra Thompson, ¶ 4. According to Thompson, "[a] CST's ability to read a computer screen is an essential element of the position." *Id.* Having established the applicable essential functions for the CST position, the Court must next address whether reasonable accommodations exist that would allow Nagel to perform those functions and whether such accommodation were requested by Nagel.

"A reasonable accommodation is one which enables a individual with a disability to perform the essential functions of the position." *Hatchett v. Philander Smith College*, 251 F.3d 670, 675 (8th Cir.2001) (citing 29 C.F.R. § 1630.2(*o*)(1)(i)). Under the terms of the ADA, "reasonable accommodation" can include

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9). As recognized by the Eighth Circuit, "[t]here is no precise test for what constitutes a reasonable accommodation, but an accommodation is unreasonable if it 'either imposes undue financial or administrative burdens, or requires a fundamental alteration in the nature of the program.'" *Buckles v. First Data Resources, Inc.*, 176 F.3d 1098, 1101 (8th Cir.1999) (quoting *DeBord v. Board of Educ.*, 126 F.3d 1102, 1106 (8th Cir.

1997)); *see* 42 U.S.C. § 12111(10)(B) (outlining numerous factors to be considered for assessing "undue hardship.").

"[A]n employee seeking a reasonable accommodation must request such an accommodation." *Hatchett*, 251 F.3d 670, 675 (citing *Mole v. Buckhorn Rubber Products, Inc.*, 165 F.3d 1212, 1217 (8th Cir.1999)). "A request for accommodation, while it need not contain any magic words, must be sufficient to convey to the employer that the employee is requesting that his disability be accommodated." *Lowery v. Hazelwood School Dist.*, 244 F.3d 654, 660 (8th Cir.2001) (citing *Wallin v. Minnesota Dep't of Corr.*, 153 F.3d 681, 689 (8th Cir. 1998)). However, "the employer is not obligated to provide the accommodation requested or preferred by the employee." *Cravens v. Blue Cross and Blue Shield of Kansas City*, 214 F.3d 1011, 1019 (8th Cir.2000) (citing 42 U.S.C. §§ 12112(b)(5)(A); 12112(b)(5)(A); *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir.1996)). Instead, the employer need only provide an accommodation that is in fact reasonable. *Id.*

The record reveals that Nagel made numerous attempts to inform Sykes of her accommodation requests. On December 23, 2002, Sykes received a letter from Dr. Charles R. Volk, Nagel's treating physician. In the letter, Dr. Volk explained that Nagel is "legally blind" and should be provided with "software and/or devices for her to be able to work." Declaration of Cassandra Thompson, Ex. 3. In a letter dated January 21, 2003, Nagel provided Sykes with a detailed request for accommodations under the ADA. *See* Declaration of Cassandra Thompson, Ex. 4. The letter mentioned specific computer software and hardware that she believed would accommodate her disability and allow her to return to work. In addition, Nagel told Cassandra Thompson of her

desire to attain the computer software utilized by Jeremy Schmidt, a legally blind employee at Sykes, referred to as the "JAWS" software. Beyond computer software and hardware, Nagel also requested the aid of a reader, as well as alternative work opportunities to include "Y-in" opportunities and janitorial work. Sykes disputes each request.

## 1. *COMPUTER SOFTWARE AND HARDWARE*

The regulations interpreting the ADA instruct that

> [o]nce a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability.

29 C.F.R. § 1630, App. § 1630.9. "Neither the ADA nor the regulations assign responsibility for when the interactive process fails." *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1136 (7th Cir.1996). However, from that directive, courts have fashioned remedies for a party's failure to take part in the interactive process. *See Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 951–952 (8th Cir.1999) (explaining the different approaches among the circuit courts for an employer's failure to take part in the interactive process). The Seventh Circuit best explained the scenario:

> No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility. For example, the cause of the breakdown might be missing information. The regulations envision such a cause.

> [I]n some instances neither the individual requesting the accommodation nor the employer can readily identify the appropriate accommodation. For example, the individual needing the accommodation may not know enough about the equipment used by the employer or the exact nature of the work site to suggest an appropriate accommodation. Likewise, the employer may not know enough about the individual's disability or the limitations that disability would impose on the performance of the job to suggest an appropriate accommodation.

> 29 C.F.R. § pt. 1630, app. Where the missing information is of the type that can only be provided by one of the parties, failure to provide the information may be the cause of the breakdown and the party withholding the information may be found to have obstructed the process. The determination must be made in light of the circumstances surrounding the case.

*Beck*, 75 F.3d 1130, 1135–1136. While most cases concern fault on behalf of the employer, a review of the case law reveals that employees are not immune from remedial measures for failing to take an active role in the process. *See Templeton v. Neodata Services, Inc.*, 162 F.3d 617 (10th Cir.1998); *Steffes v. Stepan Co.*, 144 F.3d 1070, 1073(7th Cir.1998) ("Because

[the employee] failed to hold up her end of the interactive process by clarifying the extent of her medical restrictions, [the employer] cannot be held liable for failing to provide reasonable accommodations."); *Hunt–Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago,* 104 F.3d 1004, 1013–1014 (7th Cir.1997); *Beck v. University of Wisconsin Bd. of Regents,* 75 F.3d 1130, 1135–1137 (7th Cir.1996).

Following the referenced case law, Sykes contends that Nagel failed to take part in the interactive process to the extent required. In an effort to provide the requested computer software and hardware, Sykes sought various medical records that were never provided. According to Sykes, the medical information was a necessary prerequisite to authorizing the use or purchase of the requested equipment. Sykes was concerned that the JAWS software, although successfully used by Jeremy Schmidt, would not equally assist Nagel. Not surprisingly, Nagel blames Sykes for any breakdown in the interactive process.

Having reviewed the evidence in a light most favorable to Nagel, the Court finds that she has created a genuine issue of material fact with regard to her accommodation request for computer software and hardware. While Nagel's non-responsiveness is troubling, the Court is unwilling to conclude that she was acting in "bad faith" so as to preempt recovery. Nagel generated numerous accommodation requests and informed Sykes of those requests. She has shown that Sykes employs a legally blind individual who is able to perform the essential job functions of a CST with the assistance of the JAWS software. Under the circumstances, the Court finds that a factual question exists as to whether Sykes attempted to provide reasonable accommodation under the ADA with respect to the requested computer equipment, in particular the JAWS software.

#### 2. *READER*

■ The ADA explicitly states that the term "reasonable accommodation" may include "the provision of qualified readers, or interpreters." 42 U.S.C. § 12111(9)(B). However, the regulations interpreting the ADA warn that "[a]n employer ... is not required to relocate essential functions." 29 C.F.R. § 1630, App. 1630.2(*o*). By way of example,

[a]n employer would not have to provide an individual who is legally blind with an assistant to look at identification cards for the legally blind individual. In this situation the assistant would be performing the job for the individual with the disability rather than assisting the individual to perform the job.

*Id.* (citing *Coleman v. Darden,* 595 F.2d 533 (10th Cir.1979)). The Eighth Circuit has also endorsed such an approach, explaining that "[a]n employer is not required to hire additional people or assign tasks to other employees to reallocate essential functions that an employee must perform." *Epps v. City of Pine Lawn,* 353 F.3d 588, 593, n. 5 (8th Cir.2003) (citing *Hatchett v. Philander Smith College,* 251 F.3d 670, 675 (8th Cir.2001)); *see Moritz v. Frontier Airlines, Inc.,* 147 F.3d 784, 788 (8th Cir.1998) (It is well-settled that an employer is under no obligation to reallocate the essential functions of a position that a qualified individual must perform.) (citing *Benson v. Northwest Airlines,* 62 F.3d 1108, 1112–13 (8th Cir.1995); 29 C.F.R. § 1630, App 1630.2(*o*); *Holbrook v. City of Alpharetta, Georgia,* 112 F.3d 1522, 1528 (11th Cir.1997)). Based on the undisputed job description, there is little doubt that reading is an essential job function of a CST. Under the current state of the law, Sykes is under no obligation to reallocate Nagel's duty to read. Such an accommodation is unreasonable. As a result, Na-

gel's request for a reader cannot survive summary judgment and is dismissed.

### 3. *"Y–IN" OPPORTUNITIES AND/OR JANITORIAL WORK*

 " '[R]eassignment to a vacant position'[10] is another possible accommodation under the ADA." *Benson v. Northwest Airlines,* 62 F.3d 1108, 1114 (8th Cir.1995) (quoting 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(*o*)(2)(ii)) (footnote added). "Importantly, the employee must be otherwise 'qualified' for the reassignment position." *Cravens v. Blue Cross and Blue Shield of Kansas City,* 214 F.3d 1011, 1019 (8th Cir.2000). "To be considered 'qualified' for this job, the individual must 'satisfy' the legitimate prerequisites for that alternative position, and ... be able to perform the essential functions of that position with or without reasonable accommodations...." *Id.* at 1019–1020. However, the employer is not required to create a new position, create a permanent position out of a temporary one, or "bump" another employee to facilitate reassignment. *See id.; Fjellestad v. Pizza Hut of America, Inc.,* 188 F.3d 944, 950 (8th Cir.1999). To prove the need for reassignment the plaintiff must first demonstrate that she cannot be accommodated in her current position. *See Burchett v. Target Corp.,* 340 F.3d 510, 517 (8th Cir.2003). To that end, the Eighth Circuit has held that reassignment may only be considered after other accommodation efforts have failed. *Id.* Stated differently, "the very prospect of reassignment does not even arise unless 'accommodation within the individual's current position would pose an undue hardship.' "

*Cravens v. Blue Cross and Blue Shield of Kansas City,* 214 F.3d 1011, 1019 (8th Cir.2000) (citing 29 C.F.R. § 1630.2(*o*)). "In this sense, reassignment is an accommodation of last resort." *Id.* (citing *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1301 (D.C.Cir.1998)).

 Assuming Nagel could not be accommodated in her CST position, reassignment would be unreasonable under the circumstances. On the date Nagel lost her vision, there were no full-time or permanent "Y-in" opportunities available, or vacant janitorial positions. *See* Declaration of Cassandra Thompson, ¶¶ 15–19. Nagel has offered no evidence to suggest that there were vacancies in either area of work, or that vacancies would become available in the near future. In fact, Nagel admits that she was not "privy" to what jobs were available at Sykes. Deposition of Susan Nagel, p. 503. As outlined above, the ADA does not require that an employer create a new position. Sykes has also offered evidence to suggest that Nagel was not qualified to "Y-in" or perform janitorial work thereby rendering reassignment unreasonable.[11] The Court finds that Nagel has failed to create a genuine issue of material fact regarding her reassignment request because she is unable to refute Sykes' contention that no positions were available to "Y-in" or perform janitorial work. As a result, Nagel's request for reassignment cannot survive summary judgment and is dismissed.

### B. *WARN CLAIM*

 The Worker Adjustment and Retraining Notification (WARN) Act, 29

---

**10.** The Eighth Circuit has explained that "[t]he term 'vacant position' not only includes positions that are presently vacant, but also those that the employer reasonably anticipates 'will become vacant in a short period of time.' " *Cravens,* 214 F.3d 1011, 1019 n. 5 (citing *Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1187 (6th Cir.1996)).

**11.** As with the CST position, Sykes contends that "[a] custodian's ability to see what he or she is cleaning is an essential function of the job." Declaration of Cassandra Thompson, ¶ 19.

U.S.C. §§ 2101, *et seq.*, was enacted "to ensure adequate opportunities (by way of notice of imminent employment loss) for restraining and/or reemployment." *Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1282 (8th Cir.1996) (quoting *Moore v. Warehouse Club, Inc.*, 992 F.2d 27, 30 (3d Cir.1993)). "It is designed to give 'workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully complete in the job market.' " *Id.* (citing 20 C.F.R. § 639.1 (1995); *Martin v. AMR Services Corp.*, 877 F.Supp. 108, 113 (E.D.N.Y.1995), aff'd, *Gonzalez v. AMR Services*, 68 F.3d 1529 (2d Cir.1995)). To that end, the WARN Act requires an "employer"[12] to give 60 days written notice before any "mass layoff."[13] The Act provides a remedy for "each aggrieved employee who suffers an employment loss[14] as a result of such closing or lay-off...." 29 U.S.C. § 2104(a)(1).

In the present dispute, Nagel was terminated on July 8, 2002, after receiving a WARN notice on April 2, 2002.[15] The parties seem to agree that the WARN Act applies[16] and that the 60–day notice requirement was satisfied. What remains is the sufficiency of the WARN notice. In particular, the content of the notice. A plain reading reveals that the notice contains no information regarding "bumping rights."[17] Nagel contends that the failure to include such information is actionable under the WARN Act. To support her argument, Nagel cites 20 C.F.R. § 639.7 as promulgated by the Secretary of Labor entitled "What must the [WARN] notice contain." 20 C.F.R. § 639.7 requires that the written notice be "specific" and "written in understandable language." *See* 20

**12.** "[T]he term 'employer' means any business enterprise that employs—
(A) 100 or more employees, excluding part-time employees; or
(B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)."
29 U.S.C. § 2101(a)(1).

**13.** A "mass layoff" is defined by the WARN Act as a reduction in force which:
(A) is not the result of a plant closing; and
(B) results in an employment loss at the single site of employment during any 30–day period for—
(i)(I) at least 33 percent of the employees (excluding any part-time employees); and
(II) at least 50 employees (excluding any part-time employees); or
(III) at least 500 employees (excluding any part-time employees); ...
29 U.S.C. § 2101(a)(3).
Notice must also be given in the event of a "plant closing." However, such an occurrence is not at issue in the present dispute.

**14.** " '[E]mployment loss' means (A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6–month period." 29 U.S.C. § 2101(a)(6).

**15.** From the complaint, it appears that Nagel limits her WARN claim to the July 2002 notice. Although she references the May 2003 notice, Nagel does not argue that its contents are deficient. *See* Complaint, ¶¶ 35–38. Nagel's later pleadings are limited to the July 2002 notice. *See* Plaintiff's Answer Brief on Sykes' Motion for Summary Judgment, pp. 16–20.

**16.** For purposes of summary judgment, the Court will assume that a "mass layoff" occurred in July of 2002 and that Nagel suffered an "employment loss" as a result of that action.

**17.** Bumping rights are not defined by the Act, but Sykes has offered the following definition: " 'Bumping' is a process where employees that are scheduled to be included in a reduction-in-force may be allowed to replace or 'bump' another employee who is not included in the lay-off." Defendant's Memorandum of Law in Support of its Motion for Summary Judgment, p. 17, n. 10.

C.F.R. §§ 639.7(a)(1) and (d). More important, it requires that the notice contain four elements:

(1) A statement as to whether the planned action is expected to be permanent or temporary and, if the entire plant is to be closed, a statement to that effect;

(2) The expected date when the plant closing or mass layoff will commence and the expected date when the individual employee will be separated;

(3) *An indication whether or not bumping rights exist;* and

(4) The name and telephone number of a company official to contact for further information.

29 C.F.R. § 639.7(d) (emphasis added). The regulation further provides that the notice may include any additional information which may be deemed useful to the employees "such as information on available dislocated worker assistance, and, if the planned action is expected to be temporary, the estimated duration, if known." *Id.*

With that being said, 20 C.F.R. § 639.7(a)(4) cautions that "[i]t is not the intent of the regulations, that errors in the information provided in a notice that occur because events subsequently change or that are minor, inadvertent errors are to be the basis for finding a violation of WARN."

The Labor Department's notice of proposed rulemaking stated that "in the early days of WARN implementation substantial compliance with the regulatory requirements should be sufficient to comply with WARN." 53 Fed.Reg. 49076, 49077 (1988). In its notice of final rulemaking, the Department of Labor added that "technical violations of the notice requirements not intended to evade the purposes of WARN ought to be treated differently than either the failure to give notice or the giving of notice intended to evade the purposes of the Act." 54 Fed.Reg. 16042, 16043 (1989). Minor errors, the notice explained, "should not be the basis for liability." *Id.* at 16060.

*Schmelzer v. Office of Compliance,* 155 F.3d 1364, 1368 (Fed.Cir.1998). From that language, courts have held that "Department of Labor regulations provide that technical deficiencies or omissions in notice do not invalidate notice or result in WARN liability." *Marques v. Telles Ranch, Inc.,* 867 F.Supp. 1438, 1445 (N.D.Cal.1994), aff'd, 133 F.3d 927, 1997 WL 811889 (9th Cir.1997) (citing *Carpenters District Council of New Orleans & Vicinity v. Dillard Dept. Stores, Inc.,* 15 F.3d 1275, 1287 n. 19 (5th Cir.1994) ("[N]either the regulations nor the Act itself addresses how the courts are to treat notices that are determined to be defective or inadequate."); *Kalwaytis v. Preferred Meal Systems, Inc.,* 78 F.3d 117, 121 (3d Cir.1996) (stating that 20 C.F.R. § 639.7(a)(4) symbolizes the inherent "flexibility" of the notice requirements)). In rejecting a "strict compliance" approach to the notice requirements, courts have instead "looked to the purpose underlying the WARN Act and determined whether those purposes were satisfied under the circumstances by the notice that was given to the employees." *Schmelzer,* 155 F.3d 1364, 1368 (citations omitted).

In *Marques v. Telles Ranch, Inc.,* 867 F.Supp. 1438, 1445 n. 8 (N.D.Cal.1994), aff'd, 133 F.3d 927, 1997 WL 811889 (9th Cir.1997), the employer's WARN notice did not include the date on which employment would end, information regarding bumping rights, or a name and telephone number of a company official whom could be contacted for further information in compliance with 20 C.F.R. § 639.7(d). Nevertheless, the court held that the notice was adequate under the WARN Act. Although the notice omitted certain "technical requirements" under 20 C.F.R.

§ 639.7(d), the court concluded that "these minor deviations did not cause harm to the Plaintiff's and therefore, liability should not be imposed." [18] *Id.* at 1445.

In *Schmelzer v. Office of Compliance,* 155 F.3d 1364, 1368 (Fed.Cir.1998), the employer's WARN notice did not comply with any of the four requirements outlined in 20 C.F.R. § 639.7(d). Despite that fact, the court found that the notice was satisfactory under the WARN Act. In *Schmelzer,* the plaintiff conceded "that the absence of reference to bumping rights and the omission of the telephone number of the employing official were minor omissions that do not give rise to liability, but he contend[ed] that the other two omissions rendered the notice fatally defective." *Id.* at 1367. The court disagreed, finding that the notice substantially complied with the WARN Act requirements and that the Plaintiff had suffered no prejudice as a result of the notice's defects. *Id.* at 1369–1370.

It is undisputed that Sykes' July 2002 WARN notice complies with 20 C.F.R. § 639.7(d) except with respect to the bumping rights requirement. The notice, reproduced above, included detailed information about the termination decision and the WARN Act. *See* Plaintiff's Ex. SGN–09. With respect to the bumping rights requirement, Sykes concedes that it did not include such information, but charac-terizes the omission as inadvertent. *See* Defendant's Memorandum of Law in Support of its Motion for Summary Judgment, p. 17. Sykes did not offer its employees formal bumping rights in July of 2002, nor did it do so in May of 2003. *See* Declaration of Cassandra Thompson, ¶ 11. [19] Instead, Nagel argues that Sykes maintained a "gatekeeper system" which was functionally equivalent to a bumping rights system. According to Cassandra Thompson, Sykes employees were ranked based upon certain criteria such as seniority, performance, and disciplinary history. *See* Deposition of Cassandra Thompson, Ex. SGN–15, p. 125 and 131. The rankings were utilized if and when former employees reapplied for new positions on new accounts, or when determining which employees from terminated accounts should be retained for new positions on new accounts. *Id.* at 125–126, and 128. Thompson referred to this system as Sykes' "gatekeeper." *Id.* at 132.

Having carefully reviewed the record, the Court finds that Sykes did not violate the WARN Act by way of its July 2002 notice. While the notice failed to address bumping rights, such an oversight did not prejudice Nagel. Even if the so-called "gatekeeper" system was in place in 2002, [20] there is no evidence to suggest that Nagel would have any ability to exercise rights under the system as is the case with a formal bumping rights system. Not-

---

18. In reaching such a decision, the court found that the information missing from the WARN notice was understood by the employees. For example, the affected employees were seasonal workers and "the only interpretation of the notice is that it informed the Plaintiffs that they would not be rehired the next season...." *Marques,* 867 F.Supp. 1438, 1446. Further, despite the lack contact information, "Plaintiff's clearly knew and understood how to contact Defendants because Plaintiffs had done so every season to determine the date harvesting operations were to resume." *Id.* Lastly, the issue regarding bumping rights was mooted by the fact that the Defendants were ceasing all harvesting operations.

19. The May 2003 WARN notice expressly stated that "[t]here are no bumping rights applicable to employees terminated as a result of this reduction."

20. Sykes notes that Thompson was not Human Resource Manager in 2002. Therefore, she was not involved in the 2002 reduction-in-force. *See* Defendant's Reply to Nagel's Answer Brief on Sykes' Motion for Summary Judgment, p. 6 n. 2.

withstanding such a conclusion, the WARN Act itself instructs that "[i]t is not the intent of the regulations, that errors in the information provided in a notice that occur because events subsequently change or that are minor, inadvertent errors are to be the basis for finding a violation of WARN." 20 C.F.R. § 639.7(a)(4). To allow an action for the inadvertent omission of minor information as in the present case would go against the intent of the statute and the case law interpreting it. The Court finds that Nagel's WARN claim must be dismissed.

## III. *CONCLUSION*

For the reasons set forth above, the Defendants' Motion for Summary Judgment is **GRANTED** in part (Docket No. 28). The remaining claim is Nagel's contention that Sykes failed to provide reasonable accommodations in the form of requested computer equipment, in particular the JAWS software. The Plaintiff's motion entitled "Request for Oral Argument" is **DENIED** as moot (Docket No. 37).

IT IS SO ORDERED.