# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1479

_____

| | | |
|---|---|---|
| Ronald J. Fenney, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Dakota, Minnesota & Eastern | * | District of Minnesota |
| Railroad Company, | * | |
| | * | |
| Appellee. | * | |
| _____ | * | |
| | * | |
| Equal Employment Opportunity | * | |
| Commission, | * | |
| | * | |
| Amicus on Behalf | * | |
| of the Appellant. | * | |

_____

Submitted: October 11, 2002

Filed:  April 28, 2003

_____

Before McMILLIAN, BOWMAN, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Ronald J. Fenney, an employee of the Dakota, Minnesota & Eastern Railroad
Company ("Dakota"), requested a disability accommodation from Dakota. Dakota

refused. After Fenney sued under the Americans with Disabilities Act of 1990 ("ADA") and the Minnesota Human Rights Act ("MHRA"), the District Court granted Dakota's Motion for Summary Judgment. Fenney appealed the District Court's Order. We reverse.

## I.

In 1974, while working as an engineer for another railroad, Fenney was involved in a tragic accident. The mishap severed his thumb and most of his middle finger on his right hand. The accident also damaged the radius bone in his right arm. Several operations made the problem worse. Fenney now has limited use of his right hand and arm.

Fenney began his employment with Dakota in 1990. Until the present set of events, he worked as an "on-call" locomotive engineer for Dakota. An on-call engineer performs the same duties as a regular engineer, but can be called at any time to report to work. In between shifts, on-call engineers are guaranteed at least an eight-hour rest period. Dakota notifies these engineers telephonically when they must report for their next shift. Dakota's contract with its union requires that Dakota notify the on-call engineers at least one and one-half hours before they are to arrive at work.

Until 1997, several of Dakota's employees received a call that was earlier than the minimum one and one-half hours required.[1] Employees who needed this advance or "long" call were noted on daily crew calling sheets. These crew sheets also noted the additional amount of time these employees required. Fenney usually received his call two and one-half to three hours ahead of his shift. According to Fenney, this

---

[1] Until 1992, calls were made on location. After that time, the calling was centralized at Dakota's headquarters in Brookings, South Dakota. The substance of the early call, however, was essentially the same.

additional time allowed him to bathe, dress, shave, prepare a meal, and drive himself to work on time.

In 1997, the railroad hired new management. Robert Wessler, the new superintendent of transportation, instituted a uniform two-hour advance calling time for all on-call employees. After the new policy was issued, Fenney no longer received a long call. Fenney claims that he requested the additional call time on numerous occasions after Dakota instituted the uniform two-hour call policy. Wessler admitted that Fenney asked him for the accommodation several times. Fenney also made a written requests to his union and to Vernon Colbert, Dakota's new transportation officer. Fenney's union also made a written request to Dakota.[2] Dakota responded that it would only accommodate Fenney's request if he could show written documentation that Dakota's previous management had "guaranteed" the advance call.

When Dakota refused his requested accommodation, Fenney asked that Dakota assign him to another position with regular hours, rather than risk losing his employment.[3] However, because he lacked seniority, the only regular-hours position for which Fenney could qualify was the position of weekend conductor. Conductors have regularly-scheduled work hours, but receive less pay than on-call engineers. In

---

[2] In the letter, the union noted that giving Fenney a longer call time than either the time set forth in the union contract (one and a half hours) or the uniform two hour advance call: (1) would not exceed the conditions set forth in the contract, and (2) would not be unfair to others because most, if not all, of the union members "readily understood that a person missing part of his hand would require more time than others in performing the simple tasks most people take for granted."
J.A., at 19.

[3] Under the General Code of Operating Rules for the Dakota Railroad, employees must arrive to work on time. J.A., at 12 (Rule 1.15). Failure to do so may result in termination.

addition, weekend conductors only work four days a week, while on-call engineers work up to seven days a week.

After demoting himself, Fenney filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Following an investigation, the EEOC issued Fenney a right-to-sue letter. Fenney next filed this action, alleging intentional discrimination and a failure to accommodate under the ADA and MHRA. Dakota then filed a motion for summary judgment, which the District Court granted. Fenney appealed.[4]

## II.

We review the District Court's grant of summary judgment de novo. *Spangler v. Federal Home Loan Bank*, 278 F.3d 847, 849 (8th Cir. 2002). "Summary judgment is appropriate when the evidence, viewed in a light most favorable to the nonmoving party, shows no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Id.*; Fed.R.Civ.Pro. 56(c). We determine materiality from the substantive law governing the claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material. *Id.* A material fact dispute is "genuine" if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49.

---

[4] On April 31, 2003, the EEOC appeared as *amicus curiae* and filed a brief.

## III.

The ADA[5] mandates that companies like Dakota provide "reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [it] can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A) (1994). To obtain relief under the ADA, Fenney must show that he (1) has a "disability" within the meaning of the ADA, (2) is a "qualified individual" under the ADA, and (3) "suffered an adverse employment action as a result of the disability." *Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 490 (8th Cir. 2002).

In order to evaluate Fenney's claim, however, we first must clarify the burdens of production and burdens of persuasion in ADA cases. The burden of proof depends on the type of claim that is alleged. If a party alleges a claim of discriminatory disparate treatment, then the traditional burden-shifting framework of *McDonnell Douglas* will apply. *See, e.g.*, *Stanback v. Best Diversified Products, Inc.*, 180 F.3d 903, 908 n.6 (8th Cir. 1999); *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc). The plaintiff must initially establish each element of the prima facie case. *Kiel*, 169 F.3d at 1134. The employer "must then rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment action." *Id.* at 1135. If the employer does this, then "the burden of production shifts back to the plaintiff to demonstrate that the employer's non-discriminatory reason is pretextual." *Id.*

---

[5] We have noted that the MHRA parallels the ADA, *Maziara v. Mills Fleet Farm, Inc.*, 245 F.3d 675, 678 n.3 (8th Cir. 2001), and thus we conclude that the District Court properly treated Fenney's MHRA claim as co-extensive with his ADA claims. Neither party contests this treatment on appeal.

However, if a party makes a reasonable accommodation claim, then we apply a modified burden-shifting analysis.[6] *E.g.*, *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1112 (8th Cir. 1995); *see also Dropinski v. Douglas County*, 298 F.3d 704, 707–08 (8th Cir. 2002); *Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 948–53 (8th Cir. 1999); *Montgomery v. John Deere & Co.*, 169 F.3d 556, 562–63 (8th Cir. 1999) (Lay, J., concurring) (noting that *McDonnell Douglas* should not apply in an ADA reasonable accommodation claim); *Mole v. Buckhorn Rubber Prods., Inc.*, 165 F.3d 1212, 1219–20 (8th Cir. 1999) (Lay, J., dissenting) (same); *cf. Mason v. Frank*, 32 F.3d 315, 318–19 (8th Cir. 1994) (applying the same analysis under the Rehabilitation Act of 1973). Under *Benson*, a plaintiff "at all times retains the burden of persuading the trier of fact that he has been the victim of illegal discrimination due to his disability." 62 F.3d at 1112 (citations omitted). Thus, he must first make a facial showing that he has an ADA disability and that he has suffered adverse employment action. Then he must make a facial showing that he is a "qualified individual."

To be a "qualified individual" within the meaning of the ADA, an employee must "(1) possess the requisite skill, education, experience, and training for h[is] position, and (2) be able to perform the essential job functions, with or without reasonable accommodation." *Heaser v. Toro Co.*, 247 F.3d 826, 830 (8th Cir. 2001). Although the plaintiff retains the ultimate burden of proving that he is a qualified individual, if the employer disputes that the employee can perform the essential functions of the job, then the burden shifts to the employer to "put on some evidence of those essential functions." *Benson*, 62 F.3d at 1113. This only makes sense because "much of the information which determines those essential functions lies uniquely with the employer." *Id.*

---

[6] Contrary to Dakota's claim, each claim is to be analyzed separately. *See Aka v. Washington Hosp. Cnt.*, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).

Further, if the employee cannot perform the essential functions of the job *without* an accommodation, he must only make a "facial showing that a reasonable accommodation is *possible*. . . ." *Id.* at 1112 (emphasis added). "The burden of production [then] shifts to the employer to show that it is unable to accommodate the employee." *Id.*; *Fjellestad*, 188 F.3d at 949. "If the employer can show that the employee cannot perform the essential functions of the job even with reasonable accommodation, [then] the employee must rebut that showing with evidence of his individual capabilities." *Benson*, 62 F.3d at 1113 (citations omitted). "At that point, the employee's burden merges with his ultimate burden of persuading the trier of fact that he has suffered unlawful discrimination." *Id.* (citations omitted).

Fenney's original pleadings alleged a failure-to-accommodate claim and a disparate treatment claim. *See* Dakota's Addendum, at 11. From the pleadings, however, it is clear that Fenney has abandoned his disparate treatment claim on appeal; in his briefs he makes no arguments to support it.[7] Thus, we analyze Fenney's claim under the *Benson* reasonable accommodation framework. Applying these principles, we conclude that summary judgment is inappropriate.

---

[7] In his reply brief, Fenney suggests that the EEOC makes this argument for him. *See* Fenney's Reply Br., at 8 n.6 (citing to EEOC Brief, at 23 n.6.). This is not sufficient, however, to prevent the waiver of this argument. *Etheridge v. United States*, 241 F.3d 619, 622 (8th Cir. 2001) (claims not raised on appeal are waived); *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co., Inc.*, 842 F.2d 977, 984 (8th Cir. 1988) ("Ordinarily, we consider only issues argued in the briefs filed by the parties and not those argued in the briefs filed by interested nonparties.").

## IV.

### A. "Disability"

As a threshold matter, Fenney must produce sufficient evidence to demonstrate that he has a disability within the meaning of the ADA. *Krauel v. Iowa Methodist Med. Ctr.*, 95 F.3d 674, 677 (8th Cir.1996) ("The threshold requirement for coverage under the ADA is that the plaintiff be a 'qualified individual with a disability.' "). The ADA provides several definitions for "disability."[8] The ADA disability definition that is most germane to Fenney describes a "disability" as "a physical . . . impairment that *substantially limits* one or more of the *major life activities* of [an] individual." 42 U.S.C. § 12102(2)(A) (1994) (emphasis added). Fenney has a "physical impairment"–he is missing his thumb as well as half of his middle finger on his dominate hand and has a damaged right arm. *See* 45 C.F.R. § 84.3(j)(2)(i). The parties, therefore, focus on whether Fenney's impairment "substantially limits" him in the "major life activity" of caring for himself.[9]

---

[8] The ADA fully defines a "disability" as either:

  (A) a physical or mental impairment that substantially limits one or
       more of the major life activities of such individual;
  (B) a record of such an impairment; or
  (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2) (1994 ). Fenney also urges that he meets subparts (B) and (C) of this definition. However, because Fenney has raised an issue of material fact as to subpart (A), we do not address these additional grounds.

[9] The EEOC also argues that Fenney is substantially limited in the major life activity of performing manual tasks. *See* EEOC Br., at 15–16. Because this was not argued below and because Fenney is substantially limited in the major life activity of caring for himself, this argument will not be addressed.

The ADA does not define either the term "major life activities" or the term "substantially limits." The Supreme Court has noted that "[t]here are two potential sources of guidance for interpreting [these ADA] terms[:] . . . [First are] the regulations interpreting the Rehabilitation Act of 1973 . . . and [second are] the EEOC regulations interpreting the ADA." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 193 (2002). Regulations interpreting the Rehabilitation Act of 1973 receive a high degree of deference–its persuasive authority is virtually without question. *Id.* at 194 (noting that Congress provided that "nothing . . . shall be construed to apply a lesser standard than the regulations issued by Federal agencies pursuant to [the Rehabilitation Act of 1973]."). In contrast, the amount of deference given EEOC regulations is still an open question.[10] *Id.* ("The persuasive authority of the EEOC regulations is less clear. . . . [W]e have no occasion to decide what level of deference, if any, they are due.").

Fortunately, the regulations interpreting the Rehabilitation Act provide a list of examples of "major life activities," which includes "walking, seeing, hearing" and, as relevant here, "caring for oneself." 45 C.F.R. § 84.3(j)(2)(ii); *see also Toyota*, 534 U.S. at 195; *Cooper v. Olin Corp., Winchester Div.*, 246 F.3d 1083, 1087–88 (8th Cir. 2001). Thus, Fenney's physical impairment does limit one of his  major life activities–caring for himself.

As a result, the critical issue in Fenney's case is whether that limitation is substantial. Unfortunately, the Rehabilitation Act regulations do not define the term "substantially limits." In an attempt to fill this gap, the EEOC has endeavored to

[10] No agency has been given authority to issue regulations interpreting the overarching definitions, such as "disability," found in 42 U.S.C. §12102. *Cf. Toyota*, 534 U.S. at 194. However, because neither party challenges the reasonableness of the EEOC regulations, this is an issue that we need not address. Like the Court in *Toyota*, "we assume without deciding that [the regulations are reasonable]." *Toyota*, 534 U.S. at 193.

define the term. According to the EEOC, a person is "substantially limited" if, compared to the average person in the general population, she cannot perform or is "[s]ignificantly restricted as to the condition, manner or duration under which" she "can perform a particular major life activity. . . ." 29 C.F.R. §1630.2(j)(1) (2002);[11] *Cooper*, 246 F.3d at 1088 (relying on the EEOC definition). Previously, an application of the EEOC standard would have completed our analysis.

However, the Supreme Court has recently addressed the question of what a plaintiff must demonstrate in order to establish a "substantial limitation" of a "major life activity." *See Toyota*, 534 U.S. at 194–203. In *Toyota,* the Court considered whether a plaintiff's carpal-tunnel syndrome substantially limited the specific major life activity of performing manual tasks. The Court concluded that "to be substantially limited in performing manual tasks, an individual must have an impairment that *prevents or severely restricts the individual* from doing activities that are of central importance to most people's daily lives."[12] *Id.* at 198 (emphasis added).

There are at least two ways to interpret *Toyota*'s holding. One way is to assume–as the EEOC[13] has–that *Toyota*'s analysis is limited to ADA cases that deal with the "substantial limitation" of the specific "major life activity" of performing

---

[11] Under the EEOC regulations, to determine whether an individual is substantially limited, the factfinder should consider the following factors: 1) "[t]he nature and severity of the impairment"; 2) "[t]he duration or expected duration of the impairment"; 3) "[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.* 29 C.F.R. § 1630.2(j)(2)(i)–(iii).

[12] The Court also concluded that the "impairment's impact must also be permanent or long term." *Toyota*, 534 U.S. at 198 (citing 29 C.F.R. §1630.2(j)(2)(ii)–(iii) (2002). Neither party argues this point. With good reason; Fenney's disability is permanent.

[13] *See* EEOC Br., at 12–13.

manual tasks. At least one of our sister circuits has so assumed. *See Rakity v. Dillon Companies, Inc.*, 302 F.3d 1152, 1158–60 (10th Cir. 2002) (assuming without discussing that *Toyota*'s holding was limited to the major life activity of performing manual tasks). If we were to accept this interpretation, we would then apply the less-restrictive EEOC definition. 29 C.F.R. §1630.2(j)(1) (2002). We decline to do so.

Another way to interpret *Toyota* is to assume–as Dakota has[14]–that *Toyota*'s analysis applies no matter the specific class of major life activity one is claiming.[15] The rest of our sister circuits, who have addressed this issue, agree. *Mack v. Great Dane Trailers*, 308 F.3d 776, 781 (7th Cir. 2002) ("We see no basis for confining *Toyota*'s analysis to only those cases involving the specific life activity [of performing manual tasks].");  *EEOC v. United Parcel Service, Inc.*, 306 F.3d 794, 802–803 (9th Cir. 2002) ("*Toyota* requires that . . . the impairment must prevent or severely restrict use . . . compared with how unimpaired individuals normally [would] . . . in daily life."); *see also Mulholland v. Pharmacia & Upjohn, Inc.*, Case No. 01-1325, *available at* 2002 WL 31681919, at \*3 (6th Cir. Nov. 22, 2002) (applying the *Toyota* analysis to the major life activity of learning); *cf. Waldrip v. General Electric Co.*, __ F.3d __, __ (5th Cir. 2003), *available at* 2003 WL 1204429, at \*2 & n.4 (for the specific life activity of eating "[t]he effects of an impairment must be severe to qualify as a disability under the ADA."). This interpretation results in "a higher threshold for the statute than some had believed it contained." *Dvorak v. Mostardi Platt Assoc. Inc.*, 289 F.3d 479, 484 (7th Cir. 2002).

---

[14] *See* Dakota's Br., at 13. Dakota also includes the EEOC definition in its analysis. *See id.* at 14 & n.8. The First Circuit has done likewise. *Gillen v. Fallon Ambulance Service, Inc.*, 283 F.3d 11, 21–24 (1st Cir. 2002)

[15] This, of course, does not include the major life activity of working, which the Supreme Court has specifically stated requires a different analysis. *See Sutton v. United Airlines*, 527 U.S. 471, 491 (1999); *Toyota*, 534 U.S. at 199–00.

We agree with this interpretation. A close examination of *Toyota* demonstrates that the Court defined terms of the ADA–specifically "substantially" (in the phrase "substantially limited") and "major" (in the phrase "major life activities"). *Toyota*, 534 U.S. at 197. The Court defined "substantially" to be "considerable" or "to a large degree." *Id.* (citations omitted). Thus, it concluded that "substantial limitations" of impairments "clearly preclude[ ] impairments that interfere in only a minor way . . . ." *Id.* It then defined major as "important" and reasoned that "major life activities" are ones "that are of central importance." *Id.* These terms are not just ones involved in the major life activity of performing manual tasks, but are ones which are necessary in every § 12102(2)(A) determination. We therefore conclude that Fenney must demonstrate that his impairment "prevents or severely restricts" his ability to care for himself compared with how unimpaired individuals normally care for themselves in daily life.

Fenney contends that he has adduced sufficient evidence to survive summary judgment. Specifically, Fenney has submitted a letter from his doctor, Ariel E. Birnbaum, M.D., which was specific to his impairment[16] and which stated that:

> Because of the missing right thumb, Mr. Fenney requires more time during the winter to do changes [sic] in regards to his clothing. The lack of his right thumb makes it difficult for him to do certain types of grasping motions which would delay him in terms of being able to change his clothes in cold weather.

J.A., at 20. Fenney also states in his deposition that it takes him twice as long as an average person to perform his "taking care of himself" tasks–bathing, shaving,

---

[16] *Toyota* has advised us that a claimant must "prove a disability by offering evidence that the extent of the limitation [caused by their impairment] is substantial." *Toyota*, 534 U.S. at 198. "It is insufficient for individuals attempting to prove disability under this test to merely submit evidence of a medical diagnosis of an impairment." *Id.*

preparing a meal, dressing, and going to the restroom. Such testimony must be accepted as true at the summary judgment stage. *Booth v. Hvass*, 302 F.3d 849, 851 (8th Cir. 2002).

Dakota offered no evidence to contradict Fenney's evidence. Instead, Dakota argues that when one subtracts Fenney's call time from his commute and arrival time, it leaves him too little time to care for himself.[17] This, Dakota reasons, conclusively demonstrates that Fenney's impairment cannot "prevent or severely restrict" him from caring for himself. However, Dakota bases its estimates of Fenney's schedule upon its assumptions of his daily routine. As a result, Dakota's argument only works if the facts are interpreted in its favor. However, on summary judgment the facts are viewed in the light most favorable to the nonmoving party. *Spangler*, 278 F.3d at 849. Moreover, on summary judgment we are not to weigh evidence or decide facts, but rather to determine whether there are issues for trial. *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990) Thus, we accept Fenney's testimony as true and cannot accept Dakota's assumptions as fact.

In conclusion, Fenney has proffered evidence that his impairment "severely restricted" his ability to care for himself compared with how an unimpaired individual would normally care for himself or herself in daily life. Admittedly, this evidence is

---

[17] Dakota first notes that it takes Fenney at least one hour and ten minutes to travel from his home in Minneapolis to his work station in Waseca. It also notes that he must arrive ten to fifteen minutes ahead of his report time. Dakota then notes that Fenney has asked for an extra thirty minutes of personal call time in good weather. Dakota next argues that this will leave Fenney two and one-half hours to eat, bathe, dress, and commute to Waseca. Dakota then concludes (if Fenney's commute time were to be added to his ten to fifteen minute buffer time, and this total were to be subtracted from his proposed two and a half hours call time) that Fenney is left with one hour and ten minutes. Dakota argues that in this hour and ten minutes Fenney must eat, bathe, dress, prepare a meal–thus providing himself an average time of fifteen minutes for each of the four activities.

thin. However, viewing this evidence in a light most favorable to Fenney, it creates–at a minimum–a reasonable inference from which an issue of material fact can be drawn. *See Snow v. Ridgeview Medical Ctr.*, 128 F.3d 1201, 1205 (8th Cir. 1997). Dakota has provided no evidence to conclude otherwise. Thus, the District Court was incorrect when it determined that as a matter of law Fenney is not substantially limited in the major life activity of caring for himself.

## B. "Adverse Action"

In order to overcome his initial burden of establishing a prima facie case, Fenney must also demonstrate that he suffered an adverse employment action. *See Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1032–33 (7th Cir. 1999).[18] "An adverse employment action is one that causes a material change in the terms or conditions of employment." *Brown v. Lester E. Cox Med. Ctrs.*, 286 F.3d 1040, 1045 (8th Cir. 2002) (citations omitted). To be "adverse," the action "need not always involve termination or even a decrease in benefits or pay." *Phillips v. Collings*, 256 F.3d 843, 847 (8th Cir. 2001). However, "not everything that makes an employee unhappy is an actionable adverse action." *Montandon v. Farmland Industries, Inc.*, 116 F.3d 355, 359 (8th Cir.1997) (discussing an unlawful retaliation claim in the context of Title VII) (citations omitted). Thus, "a transfer from one job to another is not an adverse employment action if it involves only minor changes in the employee's workings conditions with no reduction in pay or benefits." *Brown*, 286 F.3d at 1045 (citing *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997)).

Fenney has proffered strong evidence to show a significant, detrimental change in his working conditions. Locomotive engineers are paid more than conductors.

---

[18] *Foster* holds that, in reasonable accommodation cases, the plaintiff must show that "the disability caused the adverse employment action" and noted that "[t]his. . . element is frequently left unstated because employers will concede that the disability was the reason for the job action but will argue the 'otherwise qualified' or 'reasonable accommodation' issues." *Foster*, 168 F.3d at 132–33.

Moreover, Fenney's new conductor job only allowed him four days of work as opposed to the five to seven days that he could work as an on-call engineer. Dakota does not dispute these facts. Instead it argues that Fenney did not suffer adverse employment action because he voluntarily demoted himself to become a conductor.

While it is true that a plaintiff cannot state an adverse employee action if he voluntarily resigned, circumstances that rise to a constructive discharge–that is, one in which an employee had no choice but to quit because of the employer's actions–are also considered an adverse employment action. *Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1016 (8th Cir. 1999); *Parrish v. Immanuel Med. Ctr.*, 92 F.3d 727 732 (8th Cir. 1996). This is because the actions are not viewed as ones that are truly voluntary.

While Fenney did not suffer a constructive discharge, he argues that he essentially suffered a constructive demotion. While we have not yet recognized constructive demotion, other circuits have endorsed the concept. *E.g.*, *Simpson v. Borg-Warner Automotive, Inc.*, 196 F.3d 873, 876 (7th Cir. 1999); *Sharp v. City of Houston*, 164 F.3d 923 F.3d 923, 933–34 (5th Cir. 1999); *see also Kauffman v. Kent State Univ.*, No. 93-3302, *available at* 1994 WL 112874, at *3 (6th Cir. Apr. 1, 1994); *cf. Diaz-Gania v. Dapena-Thompson*, 90 F.3d 609, 614 (1st Cir. 1996) (recognizing "constructive demotion" in a veteran's rights discrimination case). These circuits analyze a constructive demotion as they would analyze a constructive discharge. *E.g.*, *Simpson*, 196 F.3d at 876. We agree with such an approach and will apply the same standards for constructive demotion as we apply for constructive discharge.

"A plaintiff claiming constructive discharge must show that a reasonable person would have found the conditions of employment intolerable and that the employer either intended to force the employee to resign or could have reasonably foreseen that the employee would do so as a result of its actions." *Kerns*, 178 F.3d at

-15-

1017 (citing *Hukkanen v. Int'l Union of Operating Eng'rs*, 3 F.3d 281, 284–85 (8th Cir.1993). "Additionally the plaintiff must subjectively perceive the environment to be abusive." *Johnson v. Runyon*, 137 F.3d 1081, 1083 (8th Cir.1998) (citations omitted).

Thus, to survive summary judgment on the issue of constructive demotion, Fenney must show both that he found the environment to be abusive and that an objective person in his position would have felt that he had to demote himself because of his discriminatory work conditions (i.e., Dakota's failure to accommodate).

Fenney has produced sufficient evidence to survive summary judgment. First, a person in Fenney's position would believe that he had no choice other than to demote himself. Fenney repeatedly requested an accommodation from Dakota through Wessler. Fenney also made a written request to Colbert. Colbert asked Fenney to submit a medical verification. Fenney did so. Dakota still refused to accommodate. Fenney even made a request to his union, who in turn made a request to Dakota in support of the accommodation. Dakota indicated that it would only accommodate Fenny's request if he could show written documentation that Dakota's previous management had "guaranteed" the advance call. Fenney was unable to do so.

Fenney lacked the seniority to secure a full-time locomotive engineer job. He did, however, have sufficient seniority to work as a weekend conductor–a job with regular hours. Thus, Fenney was faced with the following choice–take a lower paying job, one that he could report to on time, or show up to work late repeatedly, and risk discharge. Therefore, a reasonable person could conclude that Fenney had no choice at all. Through its actions, Dakota had created an environment in which Fenney had no choice other than to demote himself.

Moreover, by actually demoting himself based upon Dakota's refusal to accommodate, Fenney has also met the subjective requirement of a constructive demotion. As a result, he has proven both elements of a constructive demotion. This constitutes an adverse employment action.

## C. "Qualified Individual"

Finally, Fenney must prove that he is a "qualified individual" under the ADA. However, for purposes of this appeal, the parties have not expressly contested this element. *E.g.*, Appellee's Br., at 35–36; *Fenney v. Dakota, Minnesota & Eastern R.R. Corp.*, Case No. 00-1752 ADM/AJB, at 5 (Jan. 15, 2002). Although, at times the parties argue–perhaps because of confusion as to the proper standards of proof in an ADA reasonable accommodation case–whether or not the accommodation was reasonable. *E.g.*, Appellant Br. at 32–35; EEOC Br., at 18–20. As mentioned previously, a discussion of the reasonableness of an accommodation only becomes relevant when a court is analyzing the "qualified individual" prong of an ADA reasonable accommodation claim. *See supra*, at pp. 6–7. Thus, to the extent that the parties deem this issue relevant, it is an issue that the District Court may more properly address on remand. *See Whitford v. Boglino,* 63 F.3d 527, 530 (7th Cir. 1995) ("[T]he denial of summary judgment has no res judicata effect, and the district court may, in its discretion, allow a party to renew a previously denied summary judgment motion or file successive motions, particularly if good reasons exist.").

## V.

Finally, Dakota argues that Fenney's ADA claim is preempted by the Railway Labor Act, 45 U.S.C. §§ 151–188 (1994). However, by bringing a claim under the ADA, Fenney seeks to enforce a federal statutory right, not a contractual right embodied by the union contract. *Benson*, 62 F.3d at 1115; *see also Norman v. Missouri Pac. R.R.*, 414 F.2d 73, 83 (8th Cir. 1969). The ADA "provides a more extensive and broader ground for relief, specifically oriented towards the

elimination of discriminatory employment practices" and, thus, is not preempted by the Railway Labor Act. *Norman*, 414 F.2d at 83 (holding that the Railway Labor Act does not preempt Title VII of the Civil Rights Act); *Benson*, 62 F.3d at 1115 (holding that the Railway Labor Act does not preempt the ADA).

## VI.

Accordingly, for the foregoing reasons, the judgment of the District Court is reversed and remanded for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.