APPEL, Justice (dissenting).
This case is depressing.
As a society, we are often uncomfortable with the subject of depression. Victims of depression are often either in deep denial or at least embarrassed because of perceptions, frequently accurate, about potential stigmatization. Even loved ones are inclined to ignore it in favor of explanations that are less stigmatizing. Rather than confront depression in a direct and forthright manner, employers, peers, and even loved ones are frequently inclined to ignore the illness even when it impacts the victim's behavior. Third parties favor explanations that allow them to stay within their comfort zone and which may be morally satisfying. Even with persons who know better, the preferred approach is to look away under the understandable but flawed notion that "the less said, the better."
Fortunately, professionals in the healing arts have been at the forefront of the effort to alter society's impression that persons suffering depression are faking it or are somehow morally responsible for their condition. Medical professionals acknowledge, and the literature firmly establishes, that depression can dramatically alter the ability of the sufferer to perform and engage in tasks both complex and simple. Absolutely brilliant people can be immobilized. Geniuses from Lincoln to Darwin appear to have suffered, periodically at least, from debilitating depression.
Depression is not the exclusive domain of lawyers, dentists, and geniuses. Depression and depressive symptoms are disturbingly common among medical students. A recent study published in the Journal of the American Medical Society (JAMA) concluded, after canvasing almost 200 peer-reviewed studies, that the level of depression or depressive symptoms among medical students is 27.2%. Lisa S. Rotenstein et al., Prevalence of Depression, Depressive Symptoms, and Suicidal Ideation Among Medical Students: A Systematic Review and Meta-Analysis, 316 J. Am. Med. Ass'n 2214, 2214 (2016). The study noted that depression among medical students is two to five times greater than similarly aged people in the general population. Id. at 2229.
The JAMA article did not emerge from the academic ether. In the past twenty years, a significant body of medical literature has emerged dealing with various aspects of depression and mental health issues among medical students. See, e.g. , Chantal M.L.R. Brazeau et al., Distress Among Matriculating Medical Students Relative to the General Population , 89 Acad. Med. 1520, 1520 (2014); Liselotte N. Dyrbye et al., Medical Student Distress: Causes, Consequences, and Proposed Solutions , 80 Mayo Clin. Proc. 1613, 1613 (2005); Jane L. Givens & Jennifer Tjia, Distressed Medical Students' Use of Mental Health Services and Barriers to Use , 77 Acad. Med. 918, 918 (2002); Rohan Puthran et al., Prevalence of Depression Amongst Medical Students: A Meta-Analysis , 50 Med. Educ. Rev. 456, 456 (2016); Anna Rosiek et al., Chronic Stress and Suicidal Thinking Among Medical Stu dents *813 , 13 Int'l J. Envtl. Res. & Pub. Health 212, 212 (2016).
The prevalence of depression among medical students has important implications for medical schools. A leading medical scholar has published an editorial in JAMA, one of the nation's leading and widely read medical publications, warning readers across the nation and in Des Moines that the well-being of medical students is an environmental health issue for our medical schools to confront. Stuart J. Slavin, Medical Student Mental Health: Culture, Environment, and the Need for Change , 316 J. Am. Med. Ass'n 2195, 2195-96 (2016).
The need for medical schools to properly address depression among their students also has a legal dimension. Clearly, depression can be a disability covered by state and federal law. State and federal statutes prohibiting discrimination based on disability are meant to eliminate actions based upon prejudice and fear of disabilities and to prohibit responsible decision-makers from failing to make reasonable accommodations for a person's disabilities. Taylor v. Phoenixville Sch. Dist. , 184 F.3d 296, 306 (3d Cir. 1999) ; see also U.S. Airways, Inc. v. Barnett , 535 U.S. 391, 401, 122 S.Ct. 1516, 1522-23, 152 L.Ed.2d 589 (2002) ("The [Americans with Disabilities Act (ADA) ] seeks to diminish or to eliminate the stereotypical thought processes, the thoughtless actions, and the hostile reactions that far too often bar those with disabilities from participating fully in the Nation's life, including the workplace. These objectives demand unprejudiced thought and reasonable responsive reaction on the part of employers and fellow workers alike. They will sometimes require affirmative conduct to promote entry of disabled people into the work force." (Citation omitted.)). Thus, properly addressing known clinical depression of students in medical school through an interactive process and a search for reasonable accommodation is not simply a professional expectation. It is a legal requirement. Yet dealing with depression within the legal frameworks established by state and federal law is challenging in light of the pervasive stigma and animus directed toward psychiatric impairments. See Wendy F. Hensel & Gregory Todd Jones, Bridging the Physical-Mental Gap: An Empirical Look at the Impact of Mental Illness Stigma on ADA Outcomes , 73 Tenn. L. Rev. 47, 50-51 (2005) ; see also Susan Stefan, Delusion of Rights: Americans with Psychiatric Disabilities, Employment Discrimination and the Americans with Disabilities Act , 52 Ala. L. Rev. 271, 271 (2000) (suggesting that individuals with psychiatric disabilities encounter difficulties in obtaining protection through the ADA from employment discrimination).
In this case, the parties concede a medical student at Des Moines University (DMU) suffered from severe depression. Her academic performance was below expectations. The question here is whether DMU, a school dedicated to the healing arts, took appropriate steps when it learned of her depression to reasonably accommodate her by adequately engaging in the required interactive process. Based on the record below, and stripping away our preconceived notions of depression as a less-than-valid disability, I conclude that DMU is not entitled to summary judgment on the plaintiff's failure-to-accommodate claim.
Here are the details.
I. Factual and Procedural Background.
This case involves a challenge to the granting of summary judgment in a case where the plaintiff alleged a failure to accommodate a disability under the Iowa *814 Civil Rights Act, Iowa Code chapter 216. The parties do not distinguish between the Iowa Civil Rights Act and the Federal Americans with Disabilities Act. Although we have held that we are free to interpret the Iowa Civil Rights Act differently from its federal counterpart, see Haskenhoff v. Homeland Energy Sols., LLC , 897 N.W.2d 553, 604-15 (Iowa 2017) (Appel, J., concurring in part and dissenting in part); Goodpaster v. Schwan's Home Serv., Inc. , 849 N.W.2d 1, 9 (Iowa 2014), the parties do not draw any distinction between the statutes in this case. The parties simply conflate the two statutes. In light of the nature of the advocacy, we may regard the substantive standards of the two statutes as identical. Nonetheless, in all cases under the Iowa Civil Rights Act, we must keep in mind the legislature's directive that the statute is to be broadly construed in light of its purposes.[7]
II. Discussion.
A. Triggering the Interactive Process. The first question we must confront is whether Natalie Slaughter's disclosures to DMU regarding her depression were sufficient to raise a triable issue on the question of whether she disclosed enough information to trigger an interactive process to determine if a reasonable accommodation might be available to address her disability. Based on the summary judgment record, I would answer that question in the affirmative.
The interactive process is integral to the developing legal framework of disability law. As one court explained,
The interactive process is at the heart of the ADA's process and essential to accomplishing its goals. It is the primary vehicle for identifying and achieving effective adjustments which allow disabled employees to continue working without placing an "undue burden" on employers. Employees do not have at their disposal the extensive information concerning possible alternative positions or possible accommodations which employers have. Putting the entire burden on the employee to identify a reasonable accommodation risks shutting out many workers simply because they do not have the superior knowledge of the workplace that the employer has.
Barnett v. U.S. Air, Inc. , 228 F.3d 1105, 1113 (9th Cir. 2000) (en banc), vacated on other grounds by U.S. Airways , 535 U.S. 391, 122 S.Ct. 1516. In the area of disability law, the courts have consistently demanded that the parties seek to resolve the possible issues on their own through an interactive process rather than prematurely resorting to litigation with the prospect of an unpleasant, win or lose battle in the courts with post hoc rationalizations and finger pointing regarding who did what to whom and when.
The interactive process is triggered when the institution is aware of a disability and knows that the employee or student seeks a reasonable accommodation. See Beck v. Univ. of Wis. Bd. of Regents , 75 F.3d 1130, 1134 (7th Cir. 1996) ; see also Brady v. Wal-Mart Stores, Inc. , 531 F.3d 127, 135 (2d Cir. 2008) (stating that an *815 employer has a duty to engage in the interactive process if it knows or should know of the disability). Magic words are not necessary to trigger the interactive process. See Barnett , 228 F.3d at 1112 ; Smith v. Midland Brake, Inc. , 180 F.3d 1154, 1172 (10th Cir. 1999) ; Bultemeyer v. Ft. Wayne Cmty. Schs. , 100 F.3d 1281, 1285 (7th Cir. 1996). If the disabled person does not know how to ask for an accommodation in so many words, the institution should do what it can to help. Bultemeyer , 100 F.3d at 1284-85. All that is required is that the institution be aware of enough information to know that the disabled party has both a disability and desires an accommodation. See Ballard v. Rubin , 284 F.3d 957, 962 (8th Cir. 2002) ; Bultemeyer , 100 F.3d at 1284-85. Particularly when addressing a mental health issue, it is simply not necessary that the disabled person point to specific accommodations. Bultemeyer , 100 F.3d at 1284-86.
Slaughter's December 17 email plainly put DMU on notice of Slaughter's disability. She eloquently wrote,
I have struggled with depression for a very long time, and at the beginning of the semester [I] had a horrible relapse of sorts. My normally well controlled disorder ended up severely affecting my life in ways it hasn't in many years. I was barely making it through the day without breaking down, and all the emotional energy it took for me to save face at school was so exhausting that by the time I would get home I had difficulty focusing on my coursework. I was extremely demoralized because of doing poorly it just ended up as this vicious cycle. There would be days where I couldn't get anything done and then I would get really behind, then crammed right before the test, do poorly, and then go right back into depression. I started seeing a therapist when I was about half of the way through biochem and as I have been working with her my mood has improved, making it easier for me to focus on school.
I knew going into medical school that 1st year would be the most difficult for me. A lot of the material is so foreign to me and it is requiring me to use different skills than what I am used to, which we did talk about in the meeting.... [M]y issue is finding the tools that work best for me and getting my depression under control ....
While Slaughter did not explicitly state "I want/need an accommodation" in the December 17 email, she made DMU aware of her disability and her need to find tools that work for her to get her depression under control.
It seems to me that the context of the December 17 email-a response to evolving concerns about Slaughter's academic performance-would sufficiently alert a reasonable institution to trigger an interactive process to explore possible steps to accommodate her. Obviously Slaughter advised DMU that she suffered from depression of a nature that affected life functions, and in context, a factfinder could reasonably interpret the letter as a plea for help. It is unfathomable to me that medical professionals would think otherwise.[8] As such, DMU cannot get summary judgment based on a failure to trigger the interactive process.
B. DMU's Engagement in the Interactive Process. The next question is whether, on the undisputed facts, DMU adequately engaged in the interactive process. The answer to this question is no.
*816 An interactive process-according to judicial, regulatory, and secondary authorities-requires a search for an appropriate accommodation that is specifically linked to the disability at hand. We have explained that once an institution learns of a disability, it has the burden to undertake an "individualized and extensive inquiry" into the disability and to attempt to provide specifically tailored accommodations. Palmer Coll. of Chiropractic v. Davenport Civil Rights Comm'n , 850 N.W.2d 326, 337 (Iowa 2014). An educational institution "has a 'real obligation' to seek out 'suitable means of reasonably accommodating' individuals with disabilities and to submit 'a factual record indicating' it 'conscientiously carried out this statutory obligation.' " Id. (quoting Wynne v. Tufts Univ. Sch. of Med. , 932 F.2d 19, 25-26 (1st Cir. 1991) ). Other courts note that in evaluating a breakdown in the interactive process, they look for signs of failure to participate in good faith or failure to help determine what specific accommodations are necessary. Taylor , 184 F.3d at 312 ; Bultemeyer , 100 F.3d at 1285. Another court explains that
employers must consult and cooperate with disabled employees so that both parties discover the precise limitations and the types of accommodations which would be most effective. The evaluation of proposed accommodations requires further dialogue and an assessment of the effectiveness of each accommodation, in terms of enabling the employee to successfully perform the job.
Barnett , 228 F.3d at 1115.
The Equal Employment Opportunity Commission affirms the need for an interactive process tailored to an individual's disability. The interactive process "should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o )(3) (2014). The commission advocates a four-step method for an employer to engage in the interactive process and emphasizes at each step the necessity of considering individualized circumstances:
(1) Analyze the particular job involved and determine its purpose and essential functions;
(2) Consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation;
(3) In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position; and
(4) Consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer.
29 C.F.R. pt. 1630 app.
Secondary sources concur in the importance of considering individualized circumstances. One treatise explains that "[t]he process of identifying an appropriate reasonable accommodation requires an individual assessment of the particular job and the specific mental or physical limitations of the individual needing a reasonable accommodation." 2 Merrick T. Rossein, Employment Discrimination Law and Litigation § 23:45, Westlaw (database updated Dec. 2018). Other authors emphasize that the individualized response required of employers and other institutions distinguishes the interactive process from the requirements of other civil rights statutes. See PollyBeth Proctor, *817 Determining "Reasonable Accommodation" Under the ADA: Understanding Employer and Employee Rights and Obligations During the Interactive Process , 33 Sw. U. L. Rev. 51, 56 (2003) [hereinafter Proctor]; Craig A. Sullivan, The ADA's Interactive Process , 57 J. Mo. B. 116, 116 (2001). "[T]he employee and employer are required to come together at the bargaining table and ask probing questions to better understand the employee's disability and resultant limitations." Proctor, 33 Sw. U. L. Rev. at 54. That particularized inquiry "targets Congress' explicit concern in the ADA: discrimination motivated in large part by ignorance and unfounded bias on the employer's part." Id. at 55.
As a result of the need for an individualized interactive process, an offer of "standard" accommodations-without regard to the specific disability at issue-is not a reasonable accommodation. Allen v. Interior Constr. Servs., Ltd. , 214 F.3d 978, 982 (8th Cir. 2000) ("[A]n accommodation is reasonable only if it is related to the accommodated individual's disability."); Redding v. Nova Se. Univ., Inc. , 165 F.Supp.3d 1274, 1297 (S.D. Fla. 2016) ; see Barnett , 228 F.3d at 1116-17 (explaining that one of the employer's offered accommodations was insufficient because "[t]hat a tool performs a similar function doesn't make it a proper tool for a particular job" and another offered accommodation was merely a recitation of "a right [the employee] already had"). Likewise, determining the accommodations one is willing to offer before engaging in the interactive process does not satisfy the requirements of the interactive process and cannot constitute reasonable accommodations. Mosby-Meachem v. Memphis Light, Gas & Water Div. , 883 F.3d 595, 606 (6th Cir. 2018) ; Bartee v. Michelin N. Am., Inc. , 374 F.3d 906, 916 (10th Cir. 2004). An employer who simply offers generalized accommodations available to disabled and nondisabled persons alike is not engaging in the interactive process. Palmer , 850 N.W.2d at 337-38.
The requirement that the interactive process focus on the particular disability is critical, particularly in cases involving mental health. It is true, of course, that Slaughter was not excelling academically, but the question is whether her difficulties in performance were a result of her disability, and thus might be subject to reasonable accommodation, or if the admission committee at DMU made a mistake and she lacked the ability to successfully complete the academic program at DMU.
The record here makes it clear that DMU offered Slaughter the kind of assistance available to all students having academic difficulty, but there is substantial evidence that DMU never specifically considered the precise nature of Slaughter's disability and how specific accommodations might be developed to address it. Instead, upon learning of the disability, DMU simply ignored it and stayed the course, proceeding as it would have proceeded with any nondisabled student. As a result, I conclude that Slaughter presented a triable issue on the question of whether DMU engaged in the interactive process required in a case involving a disability.
It is important to emphasize that it is not necessary that the disabled individual propose specific accommodations during the interactive process. The majority repeatedly observes that Slaughter did not request a specific accommodation refused by DMU that could have allowed Slaughter to continue her studies. But whether Slaughter requested a specific accommodation during the interactive process is immaterial.[9] As stated in Taylor : "[A]n *818 employer who has received proper notice cannot escape its duty to engage in the interactive process simply because the employee did not come forward with a reasonable accommodation that would prevail in litigation." 184 F.3d at 317. Slaughter need not have identified ex ante the reasonable accommodation that the interactive process could produce. The Taylor court put an even finer point on it: "[I]t would make little sense to insist that the employee must have arrived at the end product of the interactive process before the employer has a duty to participate in that process." Id. at 316. The United States Court of Appeals for the Ninth Circuit expounds on that point:
Without the interactive process, many employees will be unable to identify effective reasonable accommodations. Without the possibility of liability for failure to engage in the interactive process, employers would have less incentive to engage in a cooperative dialogue and to explore fully the existence and feasibility of reasonable accommodations. The result would be less accommodation and more litigation, as lawsuits become the only alternative for disabled employees seeking accommodation. This is a long way from the framework of cooperative problem solving based on open and individualized exchange in the workplace that the ADA intended. Therefore, summary judgment is available only where there is no genuine dispute that the employer has engaged in the interactive process in good faith.
Barnett , 228 F.3d at 1116.
C. Consequence of Failure to Engage in the Interactive Process in Context of Defendant's Motion for Summary Judgment to Extinguish Claim. The final question we must confront is the ramification of DMU's failure to engage in the interactive process for purposes of summary judgment. I discuss three possible approaches. One approach holds that an institution's motion for summary judgment must be denied when the institution does not present undisputed facts showing that it adequately engaged in the interactive process. A second approach would deny summary judgment to an institution unless it presents undisputed facts demonstrating that engagement in an interactive process could not have produced a possible accommodation.
The third approach is a burden-shifting approach. In response to a motion for summary judgment by an institution, a plaintiff must identify a facially plausible accommodation that could have resulted from the interactive process. At that point, summary judgment is denied unless the institution presents undisputed facts that the student could not perform even with the facially plausible accommodation or that accommodating the student would pose an undue hardship.
Under any approach, our determination must rest on the Iowa summary judgment standard. I conclude that the present record precludes granting summary judgment in favor of DMU under any of these theories.
1. Iowa summary judgment standard. On review of a summary judgment grant, "[w]e examine the record to determine whether a material fact is in dispute." Schneider v. State , 789 N.W.2d 138, 143 (Iowa 2010) ; Ranes v. Adams Labs., Inc. , 778 N.W.2d 677, 685 (Iowa 2010) ; accord *819 Minor v. State , 819 N.W.2d 383, 393 (Iowa 2012) ; Gen. Car & Truck Leasing Sys., Inc. v. Lane & Waterman , 557 N.W.2d 274, 276 (Iowa 1996). Iowa courts must "view the entire record in the light most favorable to the nonmoving party." Bass v. J.C. Penney Co. , 880 N.W.2d 751, 755 (Iowa 2016) ; accord Veatch v. City of Waverly , 858 N.W.2d 1, 6 (Iowa 2015) ; Crippen v. City of Cedar Rapids , 618 N.W.2d 562, 565 (Iowa 2000). And the court must "consider on behalf of the nonmoving party every legitimate inference reasonably deduced from the record." Bagelmann v. First Nat'l Bank , 823 N.W.2d 18, 20 (Iowa 2012) (quoting Van Fossen v. MidAmerican Energy Co. , 777 N.W.2d 689, 692 (Iowa 2009) ); accord Estate of Harris v. Papa John's Pizza , 679 N.W.2d 673, 677 (Iowa 2004) (quoting Phillips v. Covenant Clinic , 625 N.W.2d 714, 717-18 (Iowa 2001) ). "We ... indulge in every legitimate inference that the evidence will bear in an effort to ascertain the existence of a fact question." Crippen , 618 N.W.2d at 565.
Summary judgment is appropriate
if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
Iowa R. Civ. P. 1.981(3) ; Banwart v. 50th Street Sports, L.L.C. , 910 N.W.2d 540, 544 (Iowa 2018). "Even if the facts are undisputed, summary judgment is not proper if reasonable minds could draw different inferences from them and thereby reach different conclusions." Banwart , 910 N.W.2d at 544-45 (quoting Clinkscales v. Nelson Sec., Inc. , 697 N.W.2d 836, 841 (Iowa 2005) ).
In Iowa, unlike the federal courts,[10] the burden of showing undisputed facts entitling the moving party to summary judgment rests with the moving party. Swainston v. Am. Family Mut. Ins. , 774 N.W.2d 478, 481 (Iowa 2009). The burden of proof remains with the moving party at all times. See Interstate Power Co. v. Ins. Co. of N. Am. , 603 N.W.2d 751, 756 (Iowa 1999). A moving party cannot shift the burden to the other party through a conclusory motion for summary judgment not supported by undisputed facts. See id. ; Midwest Mgmt. Corp. v. Stephens , 291 N.W.2d 896, 900 (Iowa 1980) ; Am. Tel. & Tel. Co. v. Dubuque Commc'ns Corp. , 231 N.W.2d 12, 14-15 (Iowa 1975). Our caselaw on this question is clear:
To obtain a grant of summary judgment on some issue in an action, the moving party must affirmatively establish the existence of undisputed facts entitling that party to a particular result under controlling law....
... When the evidentiary matter tendered in support of the motion does not affirmatively establish uncontroverted facts that sustain the moving party's right to judgment, summary judgment must be denied even if no opposing evidentiary matter is presented.
*820 Griglione v. Martin , 525 N.W.2d 810, 813 (Iowa 1994), overruled on other grounds by Winger v. CM Holdings, L.L.C. , 881 N.W.2d 443, 446 (Iowa 2016). Where a motion for summary judgment is not adequately supported, "we need not consider the sufficiency of plaintiff's resistance to the motion." Id. In this way, we do not follow the federal Celotex standard for summary judgment.[11] Id.
2. Denial of summary judgment for failure to engage in the interactive process. Several courts have denied summary judgement to an employer or institution where the record showed a triable question on whether that party failed to adequately engage in an interactive process. Barnett , 228 F.3d at 1116 (collecting cases); Taylor , 184 F.3d at 318. This approach has the effect of requiring an employer or institution to engage in an interactive process as a prerequisite to summary judgment. The reluctance to grant summary judgment in a reasonable accommodation case where there is a triable issue on whether there was an adequate interactive process is particularly strong in cases involving disabilities that are heavily stigmatized in our society. Taylor , 184 F.3d at 318. In settings involving mental health, courts should be especially wary on summary judgment of underestimating how well a disabled person may perform with accommodations or how much the bad faith arising from the failure to engage in the interactive process may have hindered the process of finding an accommodation. Id.
Slaughter avoids summary judgment under the Barnett / Taylor approach if DMU has not shown undisputed facts that it engaged in an interactive process. Griglione , 525 N.W.2d at 813. Because DMU failed to engage in the interactive process, DMU is not entitled to summary judgment under Barnett , 228 F.3d at 1116, and Taylor , 184 F.3d at 318.
3. Denial of summary judgment for failure to show that an interactive process would not have identified a reasonable accommodation. A more defendant-friendly standard would allow a defendant that failed to engage in the interactive process to obtain summary judgment if it can present undisputed facts demonstrating that the interactive process would not have produced a reasonable accommodation. Under this approach, the question under the Iowa summary judgment standard is this: Did *821 DMU, as the summary judgment movant, offer undisputed facts demonstrating there was no possible accommodation to allow this apparently bright (she was admitted to medical school) but disabled student to satisfactorily continue her studies?
In its materials in support of its motion for summary judgment, DMU does not present this material fact as not subject to genuine dispute. Nor does DMU present any evidence that the interactive process would have been futile. For that reason, DMU's summary judgment motion must fail. See Griglione , 525 N.W.2d at 813.
Indeed, the record shows that DMU cannot assert that no reasonable accommodation could have come from an interactive process. According to undisputed facts in the record, engagement in the interactive process would have entirely "changed the nature of the conversation" and could have produced at least two potential accommodations.
To begin with, it is undisputed that had Dr. Canby known of Slaughter's disability, the whole affair would have taken a different course. Further, Dr. Canby suggested that, among other things, a medical leave would have been considered. The record reveals the following questions and answers:
Q. So Natalie's [Slaughter's] depression was never discussed between you and her when you met to do the action plan because you did not know it. A. That's correct. It would have changed the nature of the conversation.
Q. It would have changed the nature entirely, would it not? A. It would have.
Q. You would have advised her to go to seek accommodation, would you not? A. I would have discussed the medical leave of absence as well.
Notably, Dr. Canby did not testify that knowledge of Slaughter's depression did not matter (the position taken by DMU in this litigation), and did not testify that there would have been no solutions had he known about the depression. Instead, he came up with at least one possible accommodation, medical leave, and admitted that the discussions would have taken an entirely different course had he known of the depression. This candid testimony undermines DMU's current white-knuckled position that there was simply nothing that could be done to accommodate the plaintiff's disability.
What would the entirely different conversation look like? We don't know for sure, but the inference is that Dr. Canby, at least, considered it at least possible that there would be accommodations available for Slaughter to see her through her depression. On summary judgment, we consider on behalf of the nonmoving party every legitimate inference that can be reasonably deduced from the record. Crippen , 618 N.W.2d at 565 ; see also Smith v. Shagnasty's Inc. , 688 N.W.2d 67, 71 (Iowa 2004) ("An inference is legitimate if it is 'rational, reasonable, and otherwise permissible under the governing substantive law.' " (quoting McIlravy v. N. River Ins. , 653 N.W.2d 323, 328 (Iowa 2002) )). Dr. Canby did not say that the depression made no difference and that he would have acted the same in any event. Indeed, Dr. Canby stated that had he known about the depression, he would have discussed a medical leave of absence "as well" as other possibilities. Other courts have noted that finite leaves of absence can be a reasonable accommodation. See, e.g. , Humphrey v. Mem'l Hosps. Ass'n , 239 F.3d 1128, 1136 (9th Cir. 2001) ; García-Ayala v. Lederle Parenterals, Inc. , 212 F.3d 638, 649-50 (1st Cir. 2000) ; Cehrs v. Nw. Ohio Alzheimer's Research Ctr. , 155 F.3d 775, 781-83 (6th Cir. 1998) ; Haschmann v. Time Warner Entm't Co. , 151 F.3d 591, 601 (7th Cir. 1998) ; see also *822 29 C.F.R. pt. 1630 app. (providing that a reasonable accommodation could include "unpaid leave for necessary treatment"). At least one court has vacated a grant of summary judgment upon determining that a leave of absence from medical school can be a reasonable accommodation for a student suffering from depression. Dean v. Univ. at Buffalo Shc. of Med. & Biomed. Scis. , 804 F.3d 178, 190-91. Further, the record does not present undisputed facts to show (1) that Slaughter would not have accepted the medical leave or (2) that she would not have been successful with the medical leave.
In addition, there is reason to believe that something could, in fact, be done short of dismissal or even short of a medical leave. In terms of her academic performance, the record shows that at the time of her dismissal from DMU, her grade point average was 2.19. This reflected her remediated grade in biochemistry. Further, if she had been allowed to remediate her physiology class and raised her grade to a C as she did in biochemistry, her grade point average would have exceeded 2.4. There is no evidence in the record that DMU routinely discharged students receiving Bs and Cs in the academic program or considered persons with Bs and Cs unqualified to continue their studies. Plainly, this is not the kind of evidence that supports a claim that it is undisputed that the interactive process would have ultimately failed.
The majority observes that Slaughter did not request an academic withdrawal or medical leave while a student at DMU. That may be true, but it is immaterial to the question before us. So too would a failure to request remediation of physiology be immaterial. As noted above, Slaughter had no duty to make the requests as part of the interactive process. And in this litigation, it is DMU's burden to offer undisputed facts showing that there was no possible accommodation to allow Slaughter to satisfactorily continue her studies. DMU cannot meet that burden, because Dr. Canby admits that medical leave is a possible accommodation and the record shows that remediation already worked for Slaughter once.
4. Denial of summary judgment under burden-shifting approach. Finally, it is worth emphasizing that Slaughter would survive summary judgment even under a similar-but distinguishable-approach taken by some federal courts. A series of federal decisions impose a burden on the employee or student to suggest-during litigation-a possible reasonable accommodation for the disability. U.S. Airways , 535 U.S. at 401-02, 122 S.Ct. at 1523 (noting that "[m]any of the lower courts" hold that, to defeat summary judgment, a plaintiff "need only show that an 'accommodation' seems reasonable on its face, i.e. , ordinarily or in the run of cases"); McMillan v. City of New York , 711 F.3d 120, 127-28 (2d Cir. 2013) (stating that, to avoid summary judgment, a plaintiff must suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits); Fenney v. Dakota, Minn. & E. R.R. , 327 F.3d 707, 712 (8th Cir. 2003) ("[H]e must only make a 'facial showing that a reasonable accommodation is possible .' " (quoting Benson v. Nw. Airlines, Inc. , 62 F.3d 1108, 1112 (8th Cir. 1995) )). If the employee or student makes such a showing, the burden shifts to the employer or institution to show that the employee or student could not perform even with the reasonable accommodation or that accommodating the employee or student would pose an undue hardship. U.S. Airways , 535 U.S. at 402, 122 S.Ct. at 1523 ; Dean , 804 F.3d at 190 ; Fenney , 327 F.3d at 712. I would not adopt the burden-shifting approach, *823 but would leave the burden squarely with the moving party.
Yet here, the record shows that "the nature of the conversation" would have "changed ... entirely" had DMU engaged in the interactive process. The record further reflects at least two possible accommodations that could have arisen from that process, medical leave and remediation. On review of a summary judgment grant, "[w]e examine the record to determine whether a material fact is in dispute," Schneider , 789 N.W.2d at 143 (emphasis added); Ranes , 778 N.W.2d at 685 ; see Minor , 819 N.W.2d at 393, and "consider on behalf of the nonmoving party every legitimate inference reasonably deduced from the record ," Bagelmann , 823 N.W.2d at 20 (emphasis added). The burden would then shift to DMU to show that either Slaughter could not perform even with the accommodations or accommodation would pose an undue hardship, U.S. Airways , 535 U.S. at 402, 122 S.Ct. at 1523 ; Dean , 804 F.3d at 190 ; Fenney , 327 F.3d at 712, and it has offered no such evidence. Consequently, Slaughter avoids summary judgment under that federal approach. The majority is mistaken in concluding otherwise.
III. Conclusion.
It must be remembered that this case involves a motion for summary judgment. As I have stated, the moving party has the burden of presenting undisputed facts that entitle the party to relief as a matter of law. Swainston , 774 N.W.2d at 481 ; Interstate Power Co. , 603 N.W.2d at 756. There was no interactive process, thereby giving rise to a presumption of bad faith. Cravens v. Blue Cross & Blue Shield of Kansas City , 214 F.3d 1011, 1021 (8th Cir. 2000).
Could there have been a reasonable accommodation for Slaughter that would have allowed her to continue her studies if DMU had engaged in the interactive process? The record suggests maybe. On the record before us, we simply do not know whether Slaughter was a brilliant and able student disabled by her depression but capable of meeting standards through appropriate accommodation or whether there was simply no way for her to satisfactorily complete her medical studies regardless of reasonable accommodations that might be offered. As a result, the undisputed facts do not entitle DMU to summary judgment. I would reverse the district court's grant of summary judgment in this case. Of course, I express no views on the ultimate outcome of this litigation, but only that DMU has not met the demanding standards for summary judgment in this case.
Cady, C.J., and Wiggins, J., join this dissent.

Nothing in this case should affect our ability to construe the disability provisions of the Iowa Civil Rights Act in a fashion different from federal courts applying federal disability law. Historically, the federal courts have interpreted disability law narrowly, ultimately triggering congressional intervention. As noted in Goodpaster , there is no reason we should be bound by the chains of narrow federal precedent. 849 N.W.2d at 9. This is particularly so in light of the explicit legislative directive that the Iowa Civil Rights Act is to be broadly construed in light its purposes. Haskenhoff , 897 N.W.2d at 607-10 (Appel, J., concurring in part and dissenting in part).

In any case, as the district court recognized, DMU expressly states in its motion for summary judgment that it does not dispute that Slaughter requested accommodations.

As further discussed below, some courts require a plaintiff-during litigation-to identify a possible accommodation to avoid summary judgment. See, e.g. , McMillan v. City of New York , 711 F.3d 120, 127-28 (2d Cir. 2013). Whatever the merits of that requirement, it is significantly different from requiring a disabled person to request-during the interactive process-a specific accommodation refused by the institution that could have allowed the person to continue working or studying.

Under federal law, when the nonmoving party bears the burden of proof at trial on a dispositive issue, the summary judgment movant's burden of production "may be discharged by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett , 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Such a motion is considered properly made under federal law whether or not accompanied by affidavits, and will thus require the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Id. at 324, 106 S.Ct. at 2553 (citation omitted).

Iowa is not the only state to reject the federal Celotex approach to summary judgment. See, e.g. , Jarboe v. Landmark Cmty. Newspapers of Ind., Inc. , 644 N.E.2d 118, 123 (Ind. 1995) ; Minnie v. City of Roundup , 257 Mont. 429, 849 P.2d 212, 214 (1993) ; see also Zachary D. Clopton, Procedural Retrenchment and the States , 106 Calif. L. Rev. 411, 429-31 (2018) (citing fourteen states that reject Celotex in whole or in part). The impact of Celotex is notable on cases brought under civil rights statutes. See Ann C. McGinley, Credulous Courts and the Tortured Trilogy: The Improper Use of Summary Judgment in Title VII and ADEA Cases , 34 B.C. L. Rev. 203, 206 (1993) (explaining that Celotex has eroded the fact finder's role in discrimination cases and substantially undermined the efficacy of antidiscrimination laws). For critical criticism of Celotex generally, see Samuel Issacharoff & George Loewenstein, Second Thoughts About Summary Judgment , 100 Yale L.J. 73, 75 (1990) (noting that the United States Supreme Court's approach to summary judgment results in a wealth transfer from plaintiffs as a class to defendants as a class); Arthur R. Miller, The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments? , 78 N.Y.U. L. Rev. 982, 1044-48 (2003) (questioning Celotex in light of "negative effects on other system values, such as accuracy, fairness, the day-in-court principle, and the jury trial right"); and Martin H. Redish, Summary Judgment and the Vanishing Trial: Implications of the Litigation Matrix , 57 Stan. L. Rev. 1329, 1330 (2005) (suggesting a causal connection between changes in the law of summary judgment and the dramatic decline in federal trials).